WANDA IVETTE MALDONADO, peticionaria, *v.* ELWOOD CRUZ DÁVILA y GLADYS ARCE, apelados.

Número: CC-2000-154          Resuelto: 8 de enero de 2004

4

6

**I**

*Sarah Torres Peralta*, abogada de la parte peticionaria; *Isabel Rodríguez Bonet*, abogada de la parte recurrida.

El Juez Asociado Señor Rebollo López emitió la opinión del Tribunal.

El vínculo matrimonial que unía a la Sra. Wanda Ivette Maldonado, aquí peticionaria, con el Sr. Elwood Cruz Dávila quedó disuelto mediante Sentencia de 6 de marzo de 1992, dictada por el Tribunal de Primera Instancia, Sala Superior de Carolina, en un procedimiento de divorcio por consentimiento mutuo. Conforme a lo estipulado por los allí peticionarios, la custodia de la menor procreada durante el matrimonio le fue adjudicada a su madre, la Sra. Wanda Ivette Maldonado, mientras que la patria potestad sería compartida por ambos progenitores. También se estipuló que el señor Cruz Dávila pagaría, en concepto de pensión alimentaria, la suma de ciento sesenta dólares mensuales. Una vez la menor comenzó a asistir a la escuela, el señor Cruz Dávila se encargó, además, del pago de la matrícula escolar —ascendente a cuatrocientos dólares anuales— y de las correspondientes mensualidades, las cuales ascendían a doscientos dólares mensuales. Cruz Dávila también pagó por un plan médico para la menor.

Así las cosas, el 7 de mayo de 1996, la señora Maldonado, en representación de su hija menor, presentó ante el foro de instancia un escrito titulado Moción Solicitando Modificación y Aumento de Pensión Alimentaria. En el referido escrito la señora Maldonado solicitó que "se decret[ara] una modificación de la pensión alimentaria vigente de $360.00 por mes, a una suma no menor de $800.00 mensuales, más el plan médico". Apéndice de la Petición de *certiorari*, pág. 37. Incluyó, además, como parte

demandada a la Sra. Gladys Arce Rosado, actual esposa del señor Cruz Dávila, alegando que ésta era "parte realmente interesada en este procedimiento, por cuanto es persona con ingresos mensuales sustanciales provenientes de su empleo, con las aportaciones correspondientes a la manutención del hogar conyugal que tiene establecido con el padre ...". Íd.

El 19 de junio de 1996, la señora Arce Rosado presentó una moción de sentencia sumaria aduciendo que, previo a contraer matrimonio, ella y su esposo otorgaron capitulaciones matrimoniales, en virtud de las cuales manifestaron *expresamente* su repudio a los principios de la sociedad de gananciales y a las reglas que rigen esta entidad jurídica, optando por acoger, *también de manera expresa*, el régimen de separación de bienes. Adujo que si bien es correcto que conforme lo dispuesto en el Art. 1308 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3661, la responsabilidad de sostener los hijos de cualquiera de los cónyuges recae sobre la sociedad legal de bienes gananciales que surge a raíz del nuevo vínculo matrimonial, en su caso en particular no existía entre ella y su esposo tal sociedad, razón por la cual era evidente que no existía ninguna obligación de su parte de contribuir económicamente en el sostenimiento de la hija menor de su esposo.

La señora Maldonado, por su parte, se opuso a la moción de sentencia sumaria, alegando que la escritura de capitulaciones a la que la señora Arce Rosado hacía referencia no era propiamente un instrumento público de capitulaciones, sino un contrato privado entre las partes donde se intentaba regular no sólo aspectos relativos a la vida conyugal de la pareja, sino, además, lo referente a las relaciones consensuales que regirían antes y después del matrimonio. Adujo que el referido instrumento adolecía de nulidad por contener cláusulas que resultaban ser ambiguas y contrarias al orden público, y que del propio texto de la escritura surgía la existencia de una comunidad de

bienes entre los esposos Cruz-Arce. Finalmente, alegó que no debía desestimarse la acción en contra de la señora Arce Rosado sin antes celebrar una vista evidenciaria a los fines de examinar si el matrimonio seguía "meticulosa y religiosamente" el régimen de separación de bienes pactado.

Luego de varios incidentes procesales, el 5 de marzo de 1997 la señora Maldonado y el señor Cruz Dávila suscribieron una estipulación sobre pensión alimentaria que fue aprobada por el foro de instancia mediante resolución emitida el 18 de febrero de 1998 y notificada el 8 de junio de 1998.[1] En esta estipulación las partes acordaron que, efectivo el día 1ro de enero de 1997, el padre alimentante pagaría la suma de quinientos dólares mensuales en concepto de pensión alimentaria para su hija menor. El señor Cruz se comprometió, además, a pagar una suma de ochocientos dólares para cubrir retroactivamente la pensión acordada y otros ochocientos dólares por concepto de honorarios de abogado. También quedó estipulado que el padre cubriría los siguientes gastos de la menor: (i) la matrícula escolar de la niña; (ii) las mensualidades escolares; (iii) el costo de los libros y efectos escolares; (iv) las tutorías, y (v) el plan médico.[2]

Transcurridos apenas cuatro meses desde que el foro de instancia aprobara la estipulación, la señora Maldonado sometió una *segunda* solicitud de aumento de pensión alimentaria, trayendo nuevamente al pleito a la señora Arce Rosado como parte indispensable. En esta ocasión la peticionaria solicitó una pensión de mil quinientos dólares mensuales, alegando que, "conforme la mejor información

---

[1] La señora Arce no fue parte en esa negociación.

[2] El 7 de febrero de 2000 el señor Cruz Dávila presentó una moción, solicitando una vista con carácter urgente, donde informó que la señora Maldonado pretendía matricular a la menor en el Colegio Saint John's en el Condado, cuyos costos duplicaban las sumas que a ese momento sufragaba el alimentante, sin consultar previamente con el padre, quien también ostenta la patria potestad de la menor. Mediante resolución a esos efectos, el foro de instancia dictaminó que el cambio de escuela, sin autorización del padre con patria potestad, no conllevaría ningún cambio sustancial en la cuantía de la pensión alimentaria de la menor.

de la Peticionaria, sujeta a verificación precisa", a la fecha en que se sometió la estipulación sobre alimentos acordada entre las partes, el padre alimentante contaba con el beneficio de ingresos sustancialmente más altos que los informados en su planilla de información personal y económica. Apéndice de la Petición de *certiorari*, pág. 133. Adujo, además, que a partir de los acuerdos alimentarios informados, los ingresos del padre alimentante, *y de su sociedad de gananciales*, habían aumentado sustancialmente, lo que a su vez también constituía un cambio significativo y sustancial que ameritaba modificación y aumento de la pensión alimentaria vigente.

Así las cosas, el 5 de agosto de 1998, la señora Arce Rosado presentó una moción de desestimación solicitando nuevamente que se le excluyera del pleito de alimentos.[3] El señor Cruz Dávila, por su parte, presentó un escrito donde alegó, entre otras cosas, que aún no había transcurrido el término establecido por ley para su revisión de la pensión alimentaria impuesta y que tampoco se alegaba la existencia de cambios sustanciales que ameritaran la modificación. Además, señaló que en la eventualidad de que el foro de instancia entendiera que los ingresos de la señora Arce Rosado debían ser considerados a los fines de establecer la pensión alimentaria de su hija menor, entonces era imperativo que el señor Anthony Michael Doran Gelabert, casado con la señora Maldonado por capitulaciones matrimoniales, también fuera traído al pleito.[4]

El tribunal de instancia emitió una sentencia sumaria parcial, desestimando la causa de acción en contra de la señora Arce Rosado "por [ésta] haber contraído matrimonio bajo el régimen de separación de bienes". Inconforme con

---

[3] En esta ocasión la señora Arce discutió básicamente los mismos planteamientos esgrimidos en su moción de sentencia sumaria.

[4] Luego de realizada la referida alegación, el señor Anthony M. Doran voluntariamente solicitó intervenir en el caso.

tal determinación, la señora Maldonado acudió, vía recurso de apelación, ante el Tribunal de Apelaciones alegando, en síntesis, que incidió el foro primario al concluir que el matrimonio de los esposos Cruz-Arce se contrajo bajo el régimen de separación de bienes basando su dictamen en una escritura de capitulaciones que adolecía de nulidad tanto en su forma como en su contenido. Sostuvo, además, que el referido foro incidió al desestimar sumariamente la acción en contra de la señora Arce pues, a su juicio, los hechos del presente caso demuestran la necesidad de celebrar una vista evidenciaria —con la señora Arce como parte indispensable— a los fines de determinar si entre ésta y el señor Cruz Dávila surgió una sociedad legal de gananciales o, en la alternativa, cuantificar las aportaciones económicas que ésta realiza al hogar conyugal a los fines de imputarle la suma de dinero resultante al señor Cruz Dávila en concepto de ingreso bruto adicional.

Mediante resolución a esos efectos, el tribunal apelativo intermedio *confirmó* el dictamen recurrido. Razonó que los esposos Cruz-Arce habían repudiado *expresamente* el régimen legal de sociedad de gananciales y que habían escogido el de separación de bienes como el *único* régimen económico que existiría entre ellos. En tal virtud, el referido foro concluyó que "en el caso de autos no existe una sociedad legal de gananciales obligada al sostenimiento de la hija del señor Cruz, procreada en su anterior matrimonio". Refiriéndose específicamente a la alegación de nulidad de las capitulaciones, el foro apelativo intermedio concluyó que eran válidas y que se habían otorgado conforme a derecho. En tal virtud, dispuso que no había necesidad alguna de celebrar una vista evidenciaria para determinar el régimen económico imperante en el matrimonio Cruz-Arce y, mucho menos, para realizar una imputación de ingresos con relación al señor Cruz Dávila.

12

Inconforme, la señora Maldonado acudió —vía *certiorari*— ante este Tribunal.([5]) Alegó que procede revocar la sentencia emitida por el foro apelativo intermedio debido a que ese foro incidió al determinar la validez del contrato de capitulaciones aquí en controversia y al concluir que en el presente caso no era necesaria la celebración de una vista evidenciaria.

*Expedimos el recurso.*([6]) Contando con las comparecencias de ambas partes y estando en condición de resolver, procedemos a así hacerlo. *Confirmamos*; veamos por qué.

I

■ El derecho a reclamar alimentos es parte esencial del principio natural de conservación que constituye piedra angular del derecho constitucional a la vida. *Martínez v. Rodríguez*, 160 D.P.R. 145 (2003); *Chévere v. Levis*, 150 D.P.R. 525 (2000). En tal virtud, hemos resuelto que los casos de alimentos, en específico los relativos a menores de edad, están revestidos del más alto interés público.([7]) Este

---

([5]) El recurso fue presentado, además, vía apelación, pues, según se alegó, existe un conflicto entre la sentencia dictada en el presente caso por el Tribunal de Circuito de Apelaciones, Circuito Regional de Carolina-Fajardo, y una dictada por el Circuito Regional de Mayagüez-Aguadilla.

([6]) El recurso fue expedido el 30 de marzo de 2000. Según surge de los autos, el 26 de abril de 2000 la señora Maldonado sometió un escrito titulado Solicitud Complementaria sobre Modificación y Aumento de Pensión Alimentaria y Otros Extremos, para informar que ya habían transcurrido más de tres años desde la fecha de efectividad de la pensión alimentaria vigente. En tal virtud, solicitó un aumento en la pensión alimentaria por una suma no menor de mil setecientos cincuenta dólares mensuales. En vista de la expedición del presente caso, la peticionaria se abstuvo —esta vez— de reclamar alimentos a la señora Arce, señalando que se reservaba los derechos que pudieran corresponderle a la resolución del presente caso.

([7]) Véanse, entre otros: *Argüello v. Argüello*, 155 D.P.R. 62 (2001); *Figueroa Robledo v. Rivera Rosa*, 149 D.P.R. 565 (1999); *Galarza Rivera v. Mercado Pagán*, 139 D.P.R. 619 (1995); *Rodríguez Sanabria v. Soler Vargas*, 135 D.P.R. 779 (1994); *Rodríguez Rosado v. Zayas Martínez*, 133 D.P.R. 406 (1993); *Robles v. Otero de Ramos*, 127 D.P.R. 911 (1991); *López v. Rodríguez*, 121 D.P.R. 23 (1988); *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61 (1987); *Quiñones v. Jiménez Conde*, 117 D.P.R. 1 (1986); *Rodríguez Avilés v. Rodríguez Beruff*, 117 D.P.R. 616 (1986); *Martínez v. Rivera Hernández*, 116 D.P.R. 164 (1985); *Otero Fernández v. Alguacil*, 116 D.P.R. 733 (1985).

interés es de categoría suprema, y se fundamenta, entre otras cosas, en principios universalmente reconocidos de solidaridad humana y en los derechos fundamentales del ser humano. *Martínez v. Rivera Hernández*, 116 D.P.R. 164, 168 (1985). Véase, además, R. Serrano Geyls, *Derecho de familia de Puerto Rico y legislación comparada*, San Juan, Ed. Programa de Educación Jurídica Continua de la Universidad Interamericana de Puerto Rico, 2002, Vol. II, pág. 1413.

■ Refiriéndonos específicamente a esta obligación, en *Martínez v. Rodríguez*, ante, señalamos que ésta "surge de la relación paterno-filial que se origina en el momento en que la paternidad o maternidad quedan establecidos legalmente".[8] Se trata, pues, de un deber que " 'existe por un derecho natural a percibir alimentos que simplemente ha sido formalizado por el legislador convirtiéndola en derecho positivo y vigente y, por otro lado, creando en el ánimo del obligado el deber de proporcionarlos independientemente de su voluntad de cumplir' ". P.F. Silva-Ruiz, *Alimentos para menores de edad en Puerto Rico: las guías mandatarias, basadas en criterios numéricos, para la determinación y modificación de pensiones alimenticias*, 52 (Núm. 2) Rev. C. Abo. P.R. 109, 112 (abril-junio 1991).

Como vemos, la naturaleza jurídica de esta obligación la diferencia del resto de las obligaciones, pues se trata de un deber legal que existe entre el alimentista y el alimentante, en virtud del vínculo parental personalísimo que los une, donde la prestación debida es vital para la persona del acreedor.[9] Ello explica que el Estado, como parte de su política pública, haya legislado ampliamente para velar por su cumplimiento. *Chévere v. Levis*, ante.

■ Una de las fuentes estatutarias de esta obligación

---

[8] Véase, además, *Chévere v. Levis*, 150 D.P.R. 525 (2000).

[9] R. Ortega-Vélez, *Compendio de Derecho de Familia*, San Juan, Pubs. J.T.S., 2000, T. II, pág. 551.

la encontramos en el Art. 153 del Código Civil, 31 L.P.R.A. sec. 601, el cual establece, en lo aquí pertinente, que el padre y la madre tienen, respecto de sus hijos no emancipados, el deber de alimentarlos, tenerlos en su compañía, educarlos e instruirlos con arreglo a su fortuna, y representarlos en el ejercicio de todas las acciones que puedan redundar en su provecho.[10] Asimismo, el Art. 142 (31 L.P.R.A. sec. 562), al regular los alimentos entre parientes, dispone que están recíprocamente obligados a darse alimentos: (i) los cónyuges; (ii) *los ascendientes y descendientes*, y (iii) el adoptante y el adoptado y sus descendientes. La tercera fuente estatutaria de esta obligación la encontramos en el Art. 1308 del Código Civil, ante, el cual preceptúa, en lo que aquí respecta, que el sostenimiento de la familia y la educación de los hijos comunes —y de cualquiera de los cónyuges— será de cargo de la sociedad de gananciales.

█ Vemos, pues, que a tenor con lo establecido en nuestro ordenamiento jurídico, la responsabilidad principal por los alimentos de los menores corresponde, de manera principalísima, al padre y a la madre, y en caso de divorcio y subsiguiente matrimonio de alguno de éstos, *de ordinario*, a la nueva sociedad de gananciales constituida entre este último y el nuevo cónyuge.[11] Sobre este particular, en *Figueroa Robledo v. Rivera Rosa*, 149 D.P.R. 565, 578 (1999), señalamos que "[u]na vez decretado el divorcio, la obligación de alimentar a los hijos menores es una obligación personal de cada uno de los ex cónyuges que deberá

---

[10] Como vemos, la obligación que establece esta disposición estatutaria no constituye propiamente un deber de alimentar autónomo o independiente, sino que se ha incorporado la obligación de alimentar al conjunto de deberes y derechos que emana de la patria potestad.

[11] En este caso, al fijar la pensión alimentaria de los menores, el tribunal deberá considerar el ingreso de ambos cónyuges a los fines de establecer la pensión alimentaria que corresponda a tenor con las disposiciones de la Ley Orgánica de la Administración para el Sustento de Menores, Ley Núm. 5 de 30 de diciembre de 1986 (8 L.P.R.A. sec. 501 *et seq.*), y las Guías para Determinar y Modificar las Pensiones Alimenticias.

ser satisfecha de su propio peculio, a excepción de aquellos casos en que el padre o la madre alimentante haya contraído nuevas nupcias, en que la obligación entonces será imputable a la nueva sociedad de gananciales que se haya constituido".([12]) Claro, que para ello es *indispensable* que el nuevo matrimonio esté constituido bajo el régimen de sociedad legal de gananciales.

■ Sobre este particular, es importante recordar que nuestro ordenamiento jurídico deja —en cuanto a la institución del matrimonio se refiere— *a la discreción de los contrayentes la organización de su propio régimen económico.* Acorde con lo anterior, los futuros cónyuges pueden pactar en capitulaciones matrimoniales el régimen económico que entiendan procedente y conveniente. A esos efectos, el Art. 1267 del Código Civil, 31 L.P.R.A. sec. 3551, dispone que "los que se unan en matrimonio podrán otorgar sus capitulaciones antes de celebrarlo, estipulando las condiciones de la sociedad conyugal relativa a los bienes presentes y futuros ...". Este mismo artículo preceptúa que, a falta de capitulaciones, o cuando éstas sean nulas o insuficientes, los cónyuges se casan bajo el régimen supletorio de la sociedad legal de gananciales.([13]) Íd. Véase, además, Serrano Geyls, ante, 1997, Vol. I, pág. 282.

■ Según señaláramos en *Domínguez Maldonado v. E.L.A.*, 137 D.P.R. 954, 960 (1995), el contrato de capitulaciones es de primordial importancia en el ámbito de la relación patrimonial del matrimonio, en la medida en que

([12]) Ello considerando lo expresado en *López v. Rodríguez*, 121 D.P.R. 23 (1988), a los efectos de que "[b]ajo los términos de ésta [sociedad], todas las ganancias, sueldos o compensaciones que obtenga cada uno de los cónyuges como producto de su trabajo, industria, profesión, juegos legales, inversiones, rentas y otros que se perciban durante la vigencia de la Sociedad, pertenecen a ésta propiamente, y no al cónyuge que los gane". Véase, además, Art. 1301 del Código Civil, 31 L.P.R.A. sec. 3641.

([13]) Adviértase que en este caso la ley "ejerce una función supletiva de la voluntad, ya que sólo fija un régimen económico legal para el caso de que no le hayan convenido las partes". C. Valverde y Valverde, *Tratado de Derecho Civil Español*, 4ta ed., Valladolid, Talleres Tipográficos Cuesta, 1938, T. IV, pág. 285.

permite regular los derechos de los esposos sobre sus bienes respectivos; los derechos sobre las ganancias realizadas por ellos durante su unión; los intereses de los hijos y de la familia; los intereses de los terceros que contratan con uno u otro de los esposos, y, en definitiva, el interés económico y social del matrimonio. En ese sentido, hemos pautado que "aunque el propósito fundamental de realizar un pacto de capitulaciones matrimoniales es establecer el régimen económico que ha de imperar en el matrimonio, este tipo de contrato puede tener otras finalidades ajenas al régimen económico conyugal." Íd.

Lo anterior significa que en el contrato de capitulaciones, los futuros cónyuges pueden estipular, no sólo las condiciones del régimen económico matrimonial, sino, además, aspectos no patrimoniales. Sobre este particular nos señala Castán que "se pueden incluir en las capitulaciones matrimoniales todos cuantos actos se puedan formalizar, conforme a las leyes, en documento público, aunque sean extraños al régimen matrimonial ...". J. Castán Tobeñas, *Derecho Civil español, común y foral*, 10ma ed., Madrid, Ed. Reus, 1983, T. V, pág. 317. Esto es, "[e]n virtud del principio de autonomía de la voluntad que late en las capitulaciones matrimoniales, pueden las partes establecer en ellas, no sólo las cláusulas y condiciones que estimen convenientes, dentro de [las] bases mínimas admitidas, sino disciplinar sectores ajenos a la vida económica del matrimonio, en su sentido estricto".[14] F. Puig Peña, *Compendio de Derecho Civil Español*, 3ra ed. rev., Madrid, Ed. Pirámide, 1976, T. V, pág. 132.

■ No cabe duda que, al pactarse de esta manera,

---

[14] Algunos tratadistas españoles, entre los que podemos mencionar a Manresa y a Lacruz Berdejo, han entendido que los acuerdos en que los cónyuges pactan sobre asuntos relacionados con los hijos o sobre sus relaciones personales no constituyen propiamente estipulaciones capitulares. Sin embargo, ambos tratadistas coinciden en que la inclusión de este tipo de acuerdo *no vicia de nulidad la escritura capitular.* J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, 6ta ed. rev., Madrid, Ed. Reus, 1969, T. IX, pág. 125; J.L. Lacruz Berdejo y F. Sancho Rebullida, *Derecho de Familia*, Barcelona, Ed. Bosch, 1982, T. IV, págs. 325–326.

sobre cómo operará y se administrará la futura sociedad conyugal, *se manifiesta el principio de la autonomía de la voluntad y la libertad individual de ambos cónyuges.* R. Ortega-Vélez, *Compendio de Derecho de Familia*, San Juan, Pubs. J.T.S., T. I, Sec. 6.2[2], pág. 255. Es al amparo de esta libertad que, al pactar sus capitulaciones matrimoniales, una pareja puede optar por: (i) la separación de bienes, pero con participación en las ganancias; (ii) sociedad de gananciales (para lo cual basta con guardar silencio y no estipular nada); (iii) renunciar al régimen legal de gananciales; (iv) total separación de bienes; (v) elegir cualquier otro régimen que combine estas posibilidades, siempre que no infrinja las leyes, la moral o las buenas costumbres. *Domínguez Maldonado v. E.L.A.*, ante, pág. 964; *Umpierre v. Torres Díaz*, 114 D.P.R. 449, 461–462 (1983).

Como vemos, los futuros cónyuges tienen *amplia libertad* para determinar y estructurar el patrimonio familiar, siempre y cuando al plasmar una u otra obligación, *no* contravengan la ley, la moral o el orden público.[15] Otras limitaciones que se imponen a la voluntad de los contratantes y que han sido denominadas como "pactos prohibidos" en las escrituras de capitulaciones, son: (i) los contrarios a la naturaleza y a los fines del matrimonio; (ii) los que inciden en la libertad y los derechos del individuo; (iii) los que contravienen los preceptos legales de carácter prohibitivo o imperativo, y (iv) los que sean depresivos de la autoridad que respectivamente corresponde en la familia a los futuros cónyuges. *Domínguez Maldonado v. E.L.A.*, ante, pág. 960. Véase, además, J.M. Manresa y Navarro, *Comen-*

---

[15] Sobre este particular, el Art. 1268 del Código Civil, 31 L.P.R.A. sec. 3552, dispone, en lo aquí pertinente, que en las capitulaciones matrimoniales "los otorgantes [no podrán] estipular nada que fuere contrario a las leyes o a las buenas costumbres, ni depresivo de la autoridad que respectivamente corresponda en la familia a los futuros cónyuges". Asimismo, establece que "[t]oda estipulacóin que no se ajuste a lo preceptuado en esta sección se tendrá por nula". Íd.

*tarios al Código Civil Español*, 6ta ed. rev., Madrid, Ed. Reus, 1969, T. IX, pág. 141.

■ Por otro lado, y en lo que respecta a las formas y solemnidades que nuestro ordenamiento jurídico exige para este tipo de contrato, el Art. 1273 (31 L.P.R.A. sec. 3557) preceptúa, en lo pertinente, que "[l]as capitulaciones matrimoniales y las modificaciones que se hagan en ellas habrán de constar por escritura pública, otorgada antes de la celebración del matrimonio". Esto es, la validez del contrato de capitulaciones se hace depender de *dos* supuestos básicos: que conste en escritura pública y que hayan sido otorgadas antes de la celebración del matrimonio.

En cuanto al primero de estos supuestos, se ha entendido que se trata de un requisito de forma *ad solemnitatem* del cual depende la existencia y validez misma de las capitulaciones. J. Santos Briz, *Derecho Civil: Teoría y Práctica*, Madrid, Ed. Rev. Der. Privado, 1982, T. V, pág. 127. Así, pues, las capitulaciones matrimoniales que no consten en escritura pública carecerán de toda validez y eficacia pues, según se ha entendido, estamos ante una condición para la existencia de la escritura y no ante un mero requisito de forma. Manresa y Navarro, ante, págs. 200–201.

■ Por otra parte, la exigencia de que las capitulaciones sean otorgadas *antes* de contraído el matrimonio es parte de una máxima que ha sido denominada como "la doctrina de inmutabilidad de las capitulaciones", establecida por nuestro Código Civil en su Art. 1272 (31 L.P.R.A. sec. 3556), y que dispone que luego de celebrado el matrimonio "no se podrán alterar las capitulaciones otorgadas antes ...".[16] En ese sentido, hemos pautado que "[s]i

---

[16] En *Vilariño Martínez v. Registrador*, 88 D.P.R. 288, 293 (1963), al explicar las razones para exigir que el contrato de capitulaciones se otorgue antes de la celebración del matrimonio, expresamos que de este modo "los interesados están en condiciones de prestar libremente su consentimiento para tal otorgamiento, y que los terceros pueden conocer el régimen adoptado y las estipulaciones convenidas partiendo de una época fija, después de la cual no puede haber alteración".

existe[n capitulaciones matrimoniales], a e[lla] han de amoldarse los cónyuges y los *terceros*; no cabe después del matrimonio *cambio ni modificación* alguna, o, lo que es lo mismo, no pueden esos cambios tener eficacia, pues las capitulaciones han de subsistir tales como fueron hechas antes del matrimonio' ". (Énfasis suplido.)([17]) *Vilariño Martínez v. Registrador*, 88 D.P.R. 288, 293 (1963).

## II

En el presente caso, la peticionaria Maldonado cuestiona la validez de las capitulaciones matrimoniales otorgadas por los esposos Cruz-Arce. Su punta de lanza, o argumento principal, es que en el documento aquí en controversia las partes regularon no sólo asuntos relacionados con el patrimonio de su futuro matrimonio, sino que, además, reglamentaron aspectos relativos a su relación prematrimonial.([18]) En tal virtud, solicita que declaremos la nulidad absoluta de las capitulaciones aquí en controversia y que, en consecuencia, concluyamos que el matrimonio de los esposos Cruz-Arce se rige por el régimen supletorio de sociedad legal de gananciales.

De entrada precisa señalar que coincidimos plenamente con el planteamiento de la peticionaria en torno a que la reglamentación de aspectos relativos a la relación consen-

---

([17]) Del mismo modo, en *Umpierre v. Torres Díaz*, 114 D.P.R. 449, 457–459 (1983), señalamos que, aun cuando la doctrina de la inmutabilidad de las capitulaciones ha caído en desuso y ha sido abolida en los más modernos códigos, en Puerto Rico la Legislatura no ha tomado acción para acoger el principio de la mutabilidad, por lo que la prohibición del Art. 1272 (31 L.P.R.A. sec. 3556), continúa vigente y debe ser rigurosamente observada, so pena de nulidad. Evidencia de la rigurosidad de este principio es el Art. 1274 del Código Civil, 31 L.P.R.A. sec. 3558, donde se exige la constancia de las alteraciones que se hagan a las capitulaciones, obviamente antes de la celebración del matrimonio, en el Protocolo del notario por nota marginal. El referido precepto exige, además, que el notario haga constar las referidas alteraciones en las copias que expida, bajo pena de indemnización por daños si no lo hiciere.

([18]) La peticionaria hace referencia a varias cláusulas en que las partes establecen que los acuerdos pactados aplicarían no sólo a su futuro matrimonio, sino también a su relación consensual; esto es, mientras permanecieran conviviendo juntos sin casarse.

sual de los futuros cónyuges en capitulaciones, ciertamente, constituye una "desviación" de lo que "ordinariamente" encontramos en este tipo de contrato. *Sin embargo*, somos del criterio que tal inclusión, *de forma alguna*, puede tener el efecto de invalidar o anular el contrato de capitulaciones aquí en controversia.

■■■ Ya hemos señalado que en las capitulaciones matrimoniales las partes pueden pactar *asuntos ajenos* al régimen patrimonial y ello, *por sí solo*, no conlleva la nulidad de la escritura capitular. De este modo, se ha establecido que en un contrato de capitulaciones las parejas pueden incluir cláusulas que, aunque relacionadas con el contrato principal, no constituyan propiamente estipulaciones o pactos capitulares. Así lo establecimos en *Umpierre v. Torres Díaz*, ante, págs. 459–460, donde, refiriéndonos al contrato de capitulaciones, expresamos que " '[s]e trata de un contrato' en que, con la salvedad de disposiciones por causa de muerte, '[c]abe que se mezclen otros contratos más o menos relacionados con el principal' ".

Lo anterior explica que algunos tratadistas hagan referencia a la doctrina de "la divisibilidad del contrato de capitulaciones". Refiriéndose a este asunto, el tratadista español José Santamaría ha expresado que "[p]ara todo lo que, aunque incluido en las capitulaciones, no constituya un verdadero pacto nupcial, se aplicarán las reglas generales de la contratación ...". J. Santamaría, *Comentarios al Código Civil*, Madrid, Ed. Rev. Der. Privado, 1958, T. II, pág. 345. Siguiendo esta misma línea de pensamiento, nos expresa Castán que pueden "encontrarse en las capitulaciones cláusulas cuya subsistencia no esté subordinada a la celebración del matrimonio; por ejemplo, un reconocimiento de hijo natural hecho por uno de los futuros contrayentes o en provecho de uno de éstos por un tercero". Castán Tobeñas, ante, pág. 300. Asimismo, se ha señalado que "[t]ales cláusulas conservarán su efecto aunque fracase el proyecto de matrimonio, porque ... se disgregan de las con-

venciones matrimoniales como un acto jurídico distinto y separado, ya no accesorio, sino principal". Íd. Como vemos, estamos ante " 'un acto esencialmente complejo, y de gran amplitud, ... capaz de comprender negocios jurídicos que no tengan relación directa con el matrimonio futuro' ". Castán Tobeñas, ante, pág. 297.

▇ De lo antes expuesto se colige que, aun cuando el principio rector de la figura de las capitulaciones es establecer el régimen patrimonial que regirá durante el matrimonio, nada impide que en éstas se incluyan pactos o acuerdos que no constituyan propiamente estipulaciones capitulares o que no estén sujetos a la condición suspensiva de que se celebre el matrimonio. *Ello, definitivamente, no constituye causa de nulidad ni convierte en ineficaces las escrituras de capitulaciones así otorgadas.* Ya hemos señalado que las *únicas* limitaciones que tienen los futuros cónyuges a la hora de otorgar sus capitulaciones matrimoniales son aquellas que surgen de los Arts. 1268 y 1269 del Código Civil, 31 L.P.R.A. secs. 3552 y 3553, y las que se imponen al amparo de la doctrina general de los contratos.

▇ A tenor con lo que disponen los referidos preceptos, se tendrán por nulas y no puestas todas las estipulaciones que sean contrarias a las leyes o a las buenas costumbres, o depresivas de la autoridad de los futuros cónyuges. También se tendrán por no puestas aquellas cláusulas en que las partes hayan pactado, de manera general, que los bienes de los cónyuges serán sometidos a costumbres especiales, obviando por completo las disposiciones del Código Civil.

Ahora bien, es de advertir que en estos casos la nulidad se *circunscribe exclusivamente* a aquellas cláusulas en que las partes hayan pactado acuerdos que contravengan las limitaciones dispuestas en el Código Civil, entendiéndose con esto que *subsistirán* todas las demás cláusulas capitulares, *siempre que* no estén relacionadas con los pactos

prohibidos.([19]) F. Puig Peña, ante, pág. 138; Manresa y Navarro, ante, pág. 159. Ello a diferencia de lo que ocurre en el caso de la nulidad absoluta, la cual tiene lugar sólo bajo ciertas y determinadas circunstancias, a saber: (i) en los casos en que las capitulaciones no hayan sido otorgadas en escritura pública;([20]) (ii) cuando el otorgamiento ha tenido lugar durante el matrimonio; (iii) si falta el consentimiento de alguna de las partes, y (iv) ante la ausencia o ilicitud del objeto o de la causa del contrato. Serrano Geyls, ante, 1997, Vol. I, pág. 307.

Luego de un análisis ponderado de la escritura de capitulaciones aquí en controversia, resulta forzoso concluir que en el presente caso *no* está presente ninguna de las causas de nulidad absoluta antes mencionadas. Aquí la pareja otorgó su contrato en escritura pública y antes de contraer matrimonio; el consentimiento prestado por las partes no ha sido cuestionado, y tampoco estamos ante un caso de ilicitud del objeto o causa del contrato. Como señaláramos anteriormente, la única "particularidad" que encontramos en esta escritura es el hecho de que en ella la pareja incluyó varias estipulaciones relativas a su relación consensual, lo cual —no cabe duda— es poco usual en contratos de este tipo. Sin embargo, y en virtud del principio de la autonomía de la voluntad y la libertad individual que reviste esta clase de contratos, en el presente caso estamos impedidos de concluir que la referida inclusión pueda, por sí sola, provocar la nulidad absoluta de la escritura bajo análisis.([21])

---

([19]) Sobre este particular, nos expresa el tratadista español Calixto Valverde que "la nulidad de un pacto no lleva consigo la nulidad de todas las capitulaciones, así que el contrato entero puede ser nulo, si sólo contiene una estipulación; pero ordinariamente no ocurrirá esto, y entonces valdrá el contrato, por lo menos, en lo relativo a la determinación de los bienes aportados por cada cónyuge, y en todo aquello que no se relacione con la cláusula o el pacto prohibido". Valverde y Valverde, ante, págs. 289–290.

([20]) Salvo el caso excepcional considerado en el Art. 1276 del Código Civil, 31 L.P.R.A. sec. 3560.

([21]) La peticionaria presentó, además, ciertos planteamientos en torno a la nulidad de varias cláusulas específicas, las cuales particularizó en su escrito. Sobre este

En vista de lo anterior, resolvemos que no erró el Tribunal de Apelaciones al confirmar la resolución del Tribunal de Primera Instancia en lo que respecta a la validez de la escritura de capitulaciones aquí en controversia.

## III

Nos corresponde atender el planteamiento de la peticionaria a los efectos de que las circunstancias específicas del caso de autos ameritan la celebración de una vista evidenciaria —con la señora Arce Rosado como parte indispensable— que permita una determinación judicial en torno a si los esposos Cruz-Arce observan "meticulosa y religiosamente" el régimen de separación de bienes pactado en sus capitulaciones o si, por el contrario, la operación económica del matrimonio demuestra la existencia de una sociedad legal de gananciales.

Con el propósito de fundamentar su contención, la peticionaria trae a nuestra atención los pronunciamientos esbozados por este Tribunal en ocasión de resolver el caso *Cepeda Torres v. García Ortiz*, 132 D.P.R. 698 (1993). A esos efectos, argumenta que la norma allí establecida impide que los tribunales puedan desestimar de plano la causa de acción del "cónyuge extraño" —que ha sido traído al pleito de alimentos como parte indispensable— una vez determinan que el matrimonio pactó *válidamente* en capitulaciones el régimen de total separación de bienes. A su entender, una vez el "cónyuge extraño" es emplazado y traído al pleito, éste debe quedar sujeto al descubrimiento de prueba de rigor y a las vistas evidenciarias que sean necesarias, incluyendo la entrega de sus planillas de con-

---

particular bástanos con señalar que, luego de haber estudiado detenidamente todas y cada una de las cláusulas del contrato de capitulaciones aquí en controversia, no albergamos duda alguna en torno al hecho de que ninguna de éstas tiene el efecto práctico de anular absolutamente la escritura de capitulaciones bajo análisis, ni invalida el repudio que hicieron los contrayentes en torno al régimen económico de sociedad de gananciales.

tribución sobre ingresos y la Planilla de Información Personal y Económica que exige la Ley Orgánica de la Administración para el Sustento de Menores, independientemente del régimen económico conyugal que exista en el matrimonio. *No estamos de acuerdo.*

■ En primer lugar, *aclaramos* el alcance de los pronunciamientos esbozados por este Tribunal en *Cepeda Torres v. García Ortiz*, ante, donde reconocimos que en todo pleito de alimentos el nuevo cónyuge del padre o madre alimentante debe ser incluido como parte indispensable, aun en los casos en que se trate de un matrimonio sujeto al régimen económico de separación de bienes. En aquel momento *nos negamos* a resolver los méritos de la controversia medular del caso —si ambos cónyuges tienen la obligación de alimentar a los hijos menores de edad habidos en el matrimonio anterior de uno de ellos independientemente del régimen económico conyugal— por entender que estábamos ante un caso de falta de parte indispensable. Resolvimos que la esposa del padre alimentante debía tener una *oportunidad efectiva para defender sus intereses*, pues, según expresamos, su patrimonio podía verse afectado si finalmente se determinaba que sus ingresos debían ser utilizados a los fines de establecer la cuantía de la pensión alimentaria allí en controversia.

■ Dicho de otra forma, en el referido caso nuestros pronunciamientos se limitaron al asunto de la necesidad de que la esposa del padre alimentante fuese traída al pleito como parte indispensable, emplazándola y notificándola de todos los procedimientos, *para evitar que sus derechos pudieran resultar perjudicados.* De este modo, entendimos que, por imperativo del debido proceso de ley, *la nueva esposa debía tener una oportunidad efectiva de defender, no sólo la validez de las capitulaciones pactadas, sino, además, el régimen económico allí estipulado.*

Debe quedar claro que en el citado caso *no resolvimos ni establecimos* que la inclusión de esta parte constituía per-

miso para que el tribunal realizara una evaluación en cuanto al comportamiento y a los actos del matrimonio a los fines de determinar si la pareja observa o no el régimen económico pactado en capitulaciones y, a base de tal determinación, variar las estipulaciones capitulares válidamente pactadas. *La razón es sencilla*: un pronunciamiento a esos efectos no sólo iría en contra de los pronunciamientos esbozados por esta Curia en *Domínguez Maldonado v. E.L.A.*, ante, sino que, además, daría al traste con la doctrina de inmutabilidad de las capitulaciones, y eso, según expresamos en *Umpierre v. Torres Díaz*, ante, pág. 459, sólo puede ser realizado por la vía legislativa. Véase, además, *Domínguez Maldonado v. E.L.A.*, ante, pág. 963.

Debe mantenerse presente que en *Domínguez Maldonado v. E.L.A.*, ante, este Tribunal *rehusó enfáticamente* reconocer la existencia de una sociedad legal de gananciales entre unos cónyuges que *expresamente* habían rechazado el régimen ganancial en sus capitulaciones matrimoniales, *aun cuando* éstos aceptaron que habían realizado actos de administración y de esfuerzo común. En aquella ocasión expresamos que resolver de otra manera tendría el efecto de "variar jurisprudencialmente la doctrina de la inmutabilidad de las capitulaciones matrimoniales". Íd., pág. 966. Según señalamos, "[o]tra cosa sería si, como en *Umpierre v. Torres Díaz*, supra, en el contrato no se hubiese determinado el régimen económico que los interesados deseaban y, además, se probara que la pareja usó y administró los bienes como si su matrimonio estuviese regido por una sociedad de gananciales, en las que ambos aportaban esfuerzo y trabajo personal". Íd., págs. 966–967.

Hoy tenemos ante nos un cuadro fáctico similar al que nos enfrentamos al resolver el caso *Domínguez Maldonado v. E.L.A.*, ante.([22]) En sus capitulaciones matrimoniales los

---

([22]) Se diferencian en que en *Domínguez Maldonado v. E.L.A.*, 137 D.P.R. 954 (1995), aunque los cónyuges acordaron en sus capitulaciones que no regiría la sociedad económica de gananciales en el matrimonio a celebrarse entre ellos, éstos no

esposos Cruz-Arce *rechazaron expresamente* el régimen de sociedad legal de gananciales al manifestar su "repudio a los principios de la sociedad de gananciales y a las reglas que rigen esta entidad jurídica" y acoger el régimen de separación de bienes. Es por ello que, tal y como sucedió en *Domínguez Maldonado v. E.L.A.*, ante, en el presente caso *estamos impedidos* de reconocer la existencia de una sociedad de gananciales; independientemente de que en su matrimonio los esposos Cruz-Arce hayan, o no, realizado actos de administración y esfuerzo común.[23]

Como expresáramos anteriormente, en nuestra jurisdicción existe una *prohibición absoluta* en cuanto a la alteración o modificación de los acuerdos capitulares, prohibición que se activa tan pronto como la pareja contrae matrimonio.[24] 31 L.P.R.A. sec. 3556. Ello significa que si los esposos Cruz-Arce pactaron válidamente que su matrimonio se regiría por el régimen de separación de bienes, " 'no cabe después del matrimonio cambio ni modificación alguna, o, lo que es lo mismo, no pueden esos cambios tener eficacia, pues las capitulaciones han de subsistir tales como fueron hechas antes del matrimonio". *Vilariño Martínez v. Registrador*, ante, pág. 293, citando a Manresa, *op. cit.*, 5ta ed., págs. 148–149.

Es por ello que, *ante tales circunstancias*, consideramos

---

indicaron bajo cuál régimen económico se regirían una vez contraído el matrimonio.

[23] Así lo expresa Manresa al señalar que si los interesados excluyen expresamente el régimen de la sociedad de gananciales, no cabe la aplicación del régimen legal supletorio que dispone el Código Civil, pues "[i]mponer éste sería contrariar de un modo manifiesto la voluntad de las partes, la libertad de estipulación". Manresa y Navarro, ante, pág. 129.

La misma conclusión se impone ante el planteamiento de la peticionaria, a los efectos de que la forma en que los cónyuges se distribuyeron las cargas familiares en sus capitulaciones evidencia la existencia de una comunidad de bienes entre ellos. Ello considerando que en el presente caso se pactó *expresamente* que el régimen que regiría durante el matrimonio sería el de separación absoluta de bienes.

[24] A tenor con lo que dispone el Art. 1271 del Código Civil, 31 L.P.R.A. sec. 3555, para que sea válida cualquier alteración que se haga en las capitulaciones matrimoniales, ésta deberá tener lugar antes de celebrarse el matrimonio y con la asistencia y concurso de las personas que intervinieron como otorgantes en el contrato original.

*innecesaria e improcedente* la celebración de una vista evidenciaria, pues, repetimos, la doctrina de la *inmutabilidad* de las capitulaciones *impide* que los tribunales puedan "restablecer" la sociedad de gananciales que los cónyuges expresamente repudiaron en capitulaciones. *Ciertamente, no tiene ningún sentido celebrar una vista a los fines de recibir una prueba que al fin y al cabo no podrá cambiar —de forma alguna— el resultado final del caso.*[25]

## IV

No podemos finalizar sin antes atender ciertos planteamientos levantados por la peticionaria Maldonado en su intento por demostrar que la actual esposa del padre alimentante es parte indispensable en el presente caso e incluir sus ingresos en la determinación de la cuantía de la pensión alimentaria de su hija menor. En primer lugar, la peticionaria nos invita a adoptar en este contexto la "doctrina de imputación de ingresos", a los fines de atribuirle al padre alimentante un ingreso adicional por cada una de las aportaciones económicas que la nueva esposa realiza en beneficio del hogar conyugal. A esos efectos, argumenta que el hecho de que el padre alimentante esté asumiendo las cargas del nuevo hogar conyugal implica que éste se está "empobreciendo" en detrimento de los alimentos que le corresponden a su hija menor. Según alega, "[e]n todo caso en que ocurre empobrecimiento voluntario de un alimentante ... como premisa general será indispensable impu-

---

[25] Abona a nuestra conclusión el hecho de que en el caso de marras, a diferencia de lo ocurrido en *Domínguez Maldonado v. E.L.A.*, ante, la pareja incluyó una cláusula donde estipuló que interesaba mantener por separado la propiedad y administración de todos sus respectivos bienes presentes y futuros. Habiéndose pactado expresamente el régimen económico de separación de bienes, y ante las limitaciones que impone nuestro ordenamiento jurídico a la mutabilidad de las cláusulas capitulares, es evidente que en el presente caso no existe la necesidad de presentar prueba tendente a demostrar cuál es el régimen económico por el que se rige este matrimonio. Resolver lo contrario, sin lugar a dudas, infligiría una herida mortal a la "doctrina de la inmutabilidad de las capitulaciones", lo cual definitivamente no le corresponde a los tribunales, sino a la Legislatura.

tarle ingresos adicionales al padre alimentante, como único medio de darle vigencia a la política pública de garantizar pensiones alimentarias para beneficio de los menores alimentistas". Petición de *certiorari*, pág. 17.

Refiriéndonos, en primer lugar, al asunto del alegado "empobrecimiento" del patrimonio del señor Cruz Dávila, precisa señalar que *ni* en la Ley Orgánica de la Administración para el Sustento de Menores *ni* en las guías preparadas por el Departamento de Servicios Sociales para determinar y modificar las pensiones alimentarias, Reglamento Núm. 4070 de 8 de diciembre de 1989,[26] se toman en consideración —como deducciones permitidas— las cargas o responsabilidades de un nuevo matrimonio a los fines de determinar la capacidad económica del padre o madre alimentante. Tal y como se desprende del texto del Art. 2(17) de la Ley Orgánica de la Administración para el Sustento de Menores, 8 L.P.R.A. sec. 501(17),[27] las *únicas* deducciones que podrán ser realizadas al momento de calcular el montante de los recursos del padre o madre alimentante son: contribuciones sobre ingreso, seguro social y otras requeridas mandatoriamente por ley. Además, podrán considerarse los pagos por concepto de planes de retiro, asociaciones, uniones, federaciones voluntarias, primas o pólizas de seguros de vida, contra accidentes, o de servicios de salud, siempre que el alimentante logre de-

---

[26] Estas guías están basadas en criterios numéricos y descriptivos, y deben ser utilizadas en todo caso en que se solicite la fijación o modificación de pensiones alimentarias.

[27] El referido artículo dispone, en lo aquí pertinente, lo siguiente:

"... Aquellos ingresos disponibles al alimentante, luego de las deducciones por concepto de contribuciones sobre ingresos, seguro social y otras requeridas mandatoriamente por ley. Se tomarán en consideración, además, a los efectos de la determinación del ingreso neto, las deducciones por concepto de planes de retiro, asociaciones, uniones y federaciones voluntarias, así como los descuentos o pagos por concepto de primas de pólizas de seguros de vida, contra accidentes o de servicios de salud cuando el alimentista sea beneficiario de éstos. La determinación final se hará según toda la prueba disponible, incluyendo estimados, estudios y proyecciones de ingresos, gastos, estilo de vida y cualquier otra prueba pertinente." 8 L.P.R.A. sec. 501(17).

mostrar que el menor con derecho a recibir alimentos, en alguna medida, se beneficia de ellos. *Martínez v. Rodríguez*, ante.

Es importante resaltar el hecho de que la ley *no permite* que se haga ninguna deducción que no esté expresamente enumerada en el texto del artículo antes citado. Como bien señala la Prof. Sarah Torres Peralta:

> El legislador se preocupó en hacer la relación precisa de los descuentos que se permitirán a los fines de determinar el ingreso neto del alimentante. Esto significa que no se permitirá ningún otro descuento [que no aparezca] en la enumeración taxativa del artículo [2(17)] de la Ley". S. Torres Peralta, *La Ley Especial de Sustento de Menores de 1994 y el derecho de alimentos en Puerto Rico*, edición especial, San Juan, Pubs. S.T.P., 1997, pág. 2.11.

Como vemos, las cargas familiares por las que el señor Cruz se responsabilizó al momento de otorgar la escritura de capitulaciones aquí en controversia —gastos personales y de ropa, gastos de hipoteca, mejoras del hogar y gastos de entretenimiento— *definitivamente no son deducibles de su ingreso bruto, por lo que no podrán ser consideradas al momento de determinar la cuantía de la pensión alimentaria de su hija menor.* A tenor con la teoría que plantea la peticionaria, *no existiendo en el presente caso la posibilidad de un "empobrecimiento" en el patrimonio del padre alimentante, no procedería entonces hablar de una "imputación de ingresos" con relación a su patrimonio.*

■     Ahora bien, somos del criterio que, aún ante un empobrecimiento del patrimonio del señor Cruz, *es imposible adoptar* en este contexto la "doctrina de imputación de ingresos". *Son dos los axiomas que militan en contra de esta contención.* En primer lugar, el hecho de que los cónyuges cumplan con la obligación legal de contribuir a las cargas familiares, *definitivamente no está reñido con la existencia de un régimen de separación de bienes.* Lo que ocurre más bien es una fusión *sui generis* donde cada uno

de los consortes responde con sus bienes privativos por las cargas o responsabilidades propias del matrimonio.

Como señala unánimemente la doctrina española, el deber de socorrerse mutuamente y de satisfacer las cargas familiares *no* depende de la existencia de régimen económico conyugal alguno, sino del nacimiento de un vínculo matrimonial. J.L. Lacruz Berdejo y F. Sancho Rebullida, *Derecho de Familia*, Barcelona, Ed. Bosch, 1982, T. IV, pág. 518; Castán Tobeñas, ante, págs. 483–484; Manresa y Navarro, ante, pág. 15; C. Vázquez Iruzubieta, *Régimen económico del matrimonio*, Madrid, Ed. Derecho Reunidas, 1982, pág. 402; Á.L. Rebolledo Varela, *Separación de bienes en el matrimonio: el régimen convencional de separación de bienes en el Código Civil*, Madrid, Ed. Montecorvo, 1983, págs. 30–31. En ese sentido se ha entendido que ningún régimen —ni siquiera el de separación absoluta— permite desconocer la realidad de una vida en común y de unas cargas que deben ser atendidas por ambos cónyuges. J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1985, T. IV, pág. 181.[28]

Tampoco podemos perder de vista el hecho de que *nada en nuestro ordenamiento impide que*, bajo el régimen de separación de bienes, *se puedan pactar obligaciones económicas dispares, de acuerdo con o en proporción a los ingresos de los cónyuges*, sin que se afecte de modo alguno la *no* responsabilidad del nuevo cónyuge, o tercero, respecto al deber de alimentar los hijos del cónyuge padre o madre. *No es posible exigir que ambos cónyuges aporten exactamente lo mismo al matrimonio; esto es, que se dividan por mitad*

---

[28] De este modo se ha expresado que "[e]l contribuir al levantamiento de las cargas del matrimonio es una obligación de los cónyuges cualquiera que sea el sistema matrimonial por el que se rijan ...". L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 5ta ed., Madrid, Ed. Tecnos, 1989, Vol. IV, pág. 233. Ciertamente, el mero hecho de la vida en común de los esposos y las atenciones familiares producen la necesidad de verificar aportaciones para atender las cargas que se generan, introduciendo un elemento asociativo que ya impide, de por sí, una absoluta independencia patrimonial. Bercovitz, *Comentarios a las reformas del derecho de familia*, Madrid, Ed. Tecnos, Vol. II, 1984, pág. 1.918.

*los gastos.* Ello resulta imposible, *incluso,* en un matrimonio que se rige bajo la sociedad de bienes gananciales. Es por ello que *no* cabe hablar de que un cónyuge recibe "beneficios" por razón de que el otro cubre o paga una proporción mayor de los gastos en que se incurre en el matrimonio.

De otra parte, la tesis de la peticionaria tampoco logra superar los obstáculos que necesariamente impone la doctrina de la inmutabilidad de las capitulaciones. No albergamos duda alguna en cuanto al hecho de que la teoría de la peticionaria —a los efectos de que las aportaciones realizadas por la señora Arce al hogar familiar deben ser consideradas como "ahorros" a los gastos propios del alimentante— *tiene el efecto directo de alterar el régimen de separación de bienes pactado por el matrimonio Cruz-Arce,* creándose, en su lugar, un régimen *semejante* a lo que en nuestro ordenamiento jurídico conocemos como la sociedad legal de gananciales. Tal actuación *está vedada* por nuestro ordenamiento jurídico.

En fin, habiéndose pactado aquí una total separación de bienes, estamos impedidos de crear, por *fíat* judicial, una sociedad legal de gananciales, sutilmente disfrazada tras la alegada "doctrina de imputación de ingresos". Hacerlo no sólo iría en contra de los pronunciamientos esbozados por este Tribunal en *Domínguez Maldonado v. E.L.A.,* ante, sino que, además, tendría el efecto de abolir la doctrina de inmutabilidad de las capitulaciones en nuestra jurisdicción.[29] *Estando ante un matrimonio contraído bajo el régimen de total separación de bienes —lo cual implica que no existe sociedad de gananciales alguna— los ingresos del esposo o esposa del padre o madre alimentante,*

---

[29] En este caso también podría suscitarse un problema de intromisión en el derecho a la intimidad, pues tal y como señala en su escrito la peticionaria, para realizar la "imputación de bienes" es necesario "escudriñar" en la relación matrimonial para determinar las aportaciones específicas que cada uno de los cónyuges hace al hogar conyugal.

*simple y sencillamente no pueden ser tomados en conside-*
*ración para fines de fijar la pensión alimentaria de los hi-*
*jos menores del padre o madre alimentante.*[30]

## V

■ Aun cuando hoy reiteramos la norma esbozada
en *Cepeda Torres v. García Ortiz*, ante —a los efectos de
que en todo pleito de alimentos en que uno de los padres
haya contraído nuevo matrimonio bajo el régimen de capi-
tulaciones matrimoniales, el cónyuge extraño deberá ser
traído al pleito como parte indispensable ante la posibili-
dad de que el tribunal determine la nulidad o ineficiencia
de las capitulaciones pactadas o del régimen económico allí
estipulado—[31] *resolvemos* que el cónyuge extraño deberá
ser *excluido inmediatamente* del pleito en la eventualidad
de que el tribunal determine que la pareja pactó *válida-*
*mente* en sus capitulaciones el régimen de total separación
de bienes. Dicho de otro modo, *la determinación judicial de*
*validez de las capitulaciones matrimoniales hace mandato-*
*ria e imperativa la decisión de excluir al cónyuge extraño*
*del procedimiento de alimentos pendiente.* Ciertamente, re-
solver que las capitulaciones matrimoniales son total-
mente válidas y, aún así, mantener al cónyuge extraño
como parte en el pleito *resulta ser un gravísimo error y una*
*enorme contradicción.*

■ Ya hemos señalado que, en lo referente a dere-
chos de alimentos, nuestro ordenamiento jurídico está fun-
damentado, *de manera principalísima*, en relaciones de pa-
rentezco, *no* reconociéndose derechos de alimentos entre

---

[30] Ortega-Vélez, ante, Vol. II, Sec.9.4[2], pág. 574; I. López Palau, *La pensión*
*alimentaria de los hijos en Puerto Rico*, 1ra ed., Ediciones Lego, 1998, págs. 41–42.

[31] En estas circunstancias, el cónyuge extraño debe tener una oportunidad
efectiva de defender, no sólo la validez de las capitulaciones, sino, además, el régi-
men económico allí pactado.

terceros o parientes por afinidad.(³²) Ello, naturalmente, permite que se plasme la *no* responsabilidad del tercero, relativa a tal obligación, en una escritura pública sobre capitulaciones matrimoniales. Habiéndose determinado en el presente caso la validez de las capitulaciones en que los esposos Cruz-Dávila repudiaron expresamente el régimen de sociedad legal de gananciales, acogiendo en su lugar el de separación absoluta, la única conclusión que se impone es a los efectos de que la señora Arce Rosado debe ser excluida del presente pleito, como correctamente dictaminaron tanto el tribunal de instancia como el tribunal apelativo intermedio.

## VI

En mérito de lo antes expuesto, *se confirma el dictamen emitido por el Tribunal de Apelaciones en el presente caso.*

*Se dictará Sentencia de conformidad.*

La Jueza Presidenta Señora Naveira Merly emitió una opinión disidente, a la cual se unió el Juez Asociado Señor Fuster Berlingeri. El Juez Asociado Señor Rivera Pérez se inhibió.

## — O —

Opinión disidente emitida por la Jueza Presidenta Señora Naveira Merly, a la que se une el Juez Asociado Señor Fuster Berlingeri.

La adjudicación del presente recurso amerita que hagamos un balance entre dos intereses que inciden sobre la relación familiar: la obligación de alimentar a los hijos menores de edad y la autonomía de la voluntad para estipular el régimen económico matrimonial. Por entender que la decisión de la mayoría tiene el efecto de validar automáti-

---

(³²) La única excepción a esto es el caso de los alimentos entre ex cónyuges.

camente unas capitulaciones matrimoniales que podrían menoscabar el bienestar de los hijos menores de edad habidos en un matrimonio previo y su derecho a recibir alimentos, disentimos.

I

El 6 de marzo de 1992, el Tribunal de Primera Instancia, Sala Superior de Carolina, decretó el divorcio por consentimiento mutuo de la Sra. Wanda Ivette Maldonado y el Sr. Elwood Cruz Dávila. Conforme a la petición de divorcio que ellos presentaron, el tribunal determinó que la señora Maldonado tendría la custodia de la hija menor procreada durante el matrimonio; que la patria potestad sería compartida por ambos progenitores, y que el señor Cruz Dávila pagaría una pensión alimentaria de ciento sesenta dólares mensuales.

El 28 de enero de 1995 el señor Cruz Dávila contrajo nupcias con la Sra. Gladys Arce. Ocho días antes de la celebración del matrimonio, el 18 de enero de 1995 éstos otorgaron una escritura de capitulaciones matrimoniales. Estipularon, entre otras cosas, que *repudiaban los principios de la sociedad legal de gananciales*; que esas reglas no aplicarían en su relación consensual ni en su matrimonio, y que *el régimen económico de su relación consensual y de su matrimonio sería el de separación de bienes.* También estipularon las deudas familiares y del hogar, de las cuales se haría cargo uno y otro cónyuge, así como las deudas privativas de éstos. *Acordaron, además, que compartirían la responsabilidad económica por los hijos que procrearan en común, pero que la responsabilidad por alimentar los hijos o parientes de uno u otro cónyuge sería privativa de cada cual.*

El 7 de mayo de 1996 la señora Maldonado presentó una moción para solicitar un aumento de pensión alimentaria a por lo menos ochocientos dólares mensuales. Además, in-

cluyó como parte demandada a la señora Arce, quien fue debidamente emplazada. La señora Maldonado adujo en la moción que, independientemente del régimen económico bajo el cual la señora Arce y el señor Cruz Dávila hubiesen contraído matrimonio, la actual esposa de éste era "parte realmente interesada en este procedimiento, por cuanto es persona con ingresos mensuales sustanciales provenientes de su empleo, con las aportaciones correspondientes a la manutención del hogar conyugal que tiene establecido con el padre ...". Apéndice de la Petición de *certiorari*, pág. 37.

La señora Arce presentó una moción de sentencia sumaria en la cual señaló que aunque de ordinario la responsabilidad por el sostenimiento de la familia y la educación de los hijos comunes y de cualquiera de los cónyuges corresponde a la sociedad legal de gananciales, habiéndose pactado expresamente entre ella y el señor Cruz Dávila el régimen de separación de bienes y el repudio al régimen económico ganancial, no procedía que se le impusiera responsabilidad personal por los alimentos de la menor hija de su esposo ni que se tomaran en cuenta sus ingresos para computar la cuantía de la pensión alimentaria que el señor Cruz Dávila debía satisfacer a favor de la menor.[1]

La señora Maldonado presentó una oposición juramentada a la moción de sentencia sumaria. Alegó que de la propia escritura de capitulaciones matrimoniales surgía su nulidad, ya que: (1) regulaban la vida prematrimonial y post divorcio de los esposos Cruz-Arce; (2) de sus propias cláusulas se desprendía la existencia de una comunidad de bienes en la cual cada cónyuge tenía asignados una serie de gastos del hogar y la familia, y (3) expresamente señalaban que la señora Arce no tendría obligación de alimentar a los hijos del señor Cruz habidos en otro matrimonio. Señaló, además, que la controversia no era susceptible de

---

[1] Con esta moción acompañó copia de la escritura de capitulaciones matrimoniales y una declaración jurada en la cual sostuvo que seguía fielmente el régimen de separación de bienes pactado entre ella y su esposo.

resolverse por la vía sumaria, ya que era necesario celebrar una vista evidenciaria para determinar si entre los cónyuges surgió una sociedad legal de gananciales. En la alternativa, adujo que precisaba celebrar una vista evidenciaria, con la señora Arce como parte indispensable, para cuantificar las aportaciones que ésta hacía al hogar y de esta forma imputar la suma restante al señor Cruz Dávila como ingreso bruto a los fines de fijar la cuantía de la pensión alimentaria.[2]

Así las cosas, el 5 de marzo de 1997 la señora Maldonado y el señor Cruz Dávila presentaron una estipulación ante el tribunal de instancia en la cual establecieron que el señor Cruz Dávila pagaría una pensión alimentaria de quinientos dólares mensuales, más las mensualidades del colegio, gastos escolares relacionados y el plan médico de la menor. Luego de varios incidentes procesales, el foro de instancia dictó sentencia de acuerdo con dicha estipulación y la notificó el 4 de marzo de 1998.

Aproximadamente cuatro meses más tarde, el 1ro de julio de 1998, la señora Maldonado presentó una nueva moción en la cual solicitó un aumento de pensión alimentaria en la cual incluyó como partes en el epígrafe al señor Cruz Dávila, la señora Arce y *la sociedad legal de gananciales compuesta por ambos.* Alegó que luego de la fecha de la estipulación sobre alimentos ocurrieron cambios significativos, sustanciales e imprevistos que justificaban su petición de aumento de pensión. Señaló la señora Maldonado que los ingresos del padre alimentante y de su sociedad de gananciales habían aumentado sustancialmente, así como también los gastos de la menor, mientras que sus ingresos habían disminuido significativamente luego de la fecha de la estipulación. En consecuencia, solicitó un aumento de pensión a por lo menos mil quinientos dólares mensuales.

---

[2] Cabe señalar que no surge del expediente que la señora Maldonado hubiese solicitado tiempo para realizar un descubrimiento de prueba que le permitiese obtener la prueba necesaria para refutar las aseveraciones de la señora Arce.

La señora Arce compareció nuevamente y presentó una moción de desestimación de la demanda en cuanto a su persona. A esta moción incorporó por referencia las alegaciones que hiciera en su solicitud de sentencia sumaria y reiteró que por haber contraído matrimonio bajo el régimen de separación de bienes, sus ingresos no deberían ser considerados al determinar la pensión alimentaria de la menor.

Por su parte, el señor Cruz Dávila se opuso al aumento de pensión alimentaria. Alegó que la cantidad solicitada era irrazonable, pues él cubría todos los gastos de la menor, incluso la matrícula del colegio, las mensualidades escolares, el plan médico, las clases de ballet y los deducibles médico-hospitalarios. Indicó, además, que si su esposa era incluida en el pleito, aun habiéndose casado bajo el régimen de separación de bienes, sería entonces imperativo traer como parte indispensable al nuevo esposo de la señora Maldonado, el Sr. Antonio Dorán, de quien la peticionaria alegó que dependía económicamente.[3] El tribunal de instancia celebró una vista el 22 de febrero de 1999 en la cual estuvieron presentes el señor Cruz Dávila, la señora Maldonado y su esposo, el señor Dorán. En ésta las partes llegaron a una serie de acuerdos en torno a las relaciones paterno-filiales.

El 19 de marzo de 1999 el foro de instancia dictó una sentencia en la cual desestimó sumariamente la demanda en solicitud de aumento de pensión alimentaria respecto a la señora Arce, por ésta haber contraído matrimonio con el padre alimentante luego de otorgar capitulaciones matrimoniales en que estableció el régimen de separación de bienes. De esta determinación recurrió la señora Maldonado ante el Tribunal de Circuito de Apelaciones (en adelante Tribunal de Circuito) y alegó que las capitulaciones

---

[3] El señor Cruz Dávila también indicó que se proponía solicitar la revisión de la pensión alimentaria "en base a los ingresos de la promovente y su esposo actual". Sin embargo, no surge del expediente que el señor Dorán hubiese sido emplazado en el pleito que nos ocupa posteriormente.

matrimoniales eran nulas y que era necesario celebrar una vista evidenciaria para determinar cuál era el verdadero régimen económico del matrimonio y si procedía que se le imputaran al señor Cruz Dávila ingresos adicionales a raíz de las aportaciones económicas de la señora Arce al hogar conyugal.

El Tribunal de Circuito dictó sentencia en la que confirmó el dictamen del foro primario. Resolvió que la escritura de capitulaciones no era nula y que, aun de existir alguna cláusula contraria a la ley, ésta se tendría por no puesta y no afectaba el resultado del caso. Concluyó, además, que la obligación de sostener a los hijos comunes y de cualquiera de los cónyuges correspondía a la sociedad legal de gananciales, régimen que específicamente rechazaron los esposos Cruz-Arce en sus capitulaciones, por lo que el sostenimiento de la menor correspondía únicamente a su padre, el señor Cruz Dávila. Finalmente, el foro apelativo concluyó que no era necesaria una vista evidenciaria para determinar cuál era el régimen económico del matrimonio Cruz-Arce o para evaluar cuál era la aportación económica de la señora Arce al matrimonio, y así cuantificar los ingresos adicionales que debían imputársele al señor Cruz Dávila.

Inconforme, la señora Maldonado recurrió ante nos mediante un recurso de *certiorari*. Alegó, en síntesis: (1) que la escritura de capitulaciones era nula en su forma y contenido, pues extendía la aplicación de sus cláusulas a la relación pre y post matrimonial de los señores Cruz-Arce, por contener cláusulas contradictorias entre sí y por contener cláusulas contrarias a la ley; (2) que a la luz de las cláusulas de la escritura, correspondía que se celebrase una vista evidenciaria a los fines de determinar cuál era el verdadero régimen económico del matrimonio, pues la escritura realmente establecía una comunidad de bienes entre los esposos Cruz-Arce, y (3) que en las circunstancias del presente caso aplicaba la doctrina de imputación de

ingresos, la cual requiere que en casos en que se haya pactado la separación de bienes, se determine en forma específica cuáles son las aportaciones de cada cónyuge al hogar y la familia al momento de fijar la pensión alimentaria.

Examinemos los preceptos aplicables al recurso de autos.

## II

La controversia ante nos requiere que determinemos si actuaron correctamente el foro de instancia y el apelativo al desestimar sumariamente la demanda en cuanto a la señora Arce por entender que las capitulaciones matrimoniales otorgadas entre ésta y su esposo eran válidas.[4]

La sentencia sumaria es un remedio extraordinario y discrecional que sólo se debe conceder cuando no existe una controversia genuina sobre hechos materiales y lo que resta es aplicar el Derecho, por lo que no hay necesidad de celebrar una vista evidenciaria. Véanse: *Sánchez v. Aut. de los Puertos*, 153 D.P.R. 559 (2001); *Consejo Tit. C. Parkside v. MGIC Fin. Corp.*, 128 D.P.R. 538, 548–549 (1991); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714, 719–723 (1986). Cualquier duda sobre la existencia de una controversia sobre los hechos materiales se debe resolver contra la parte promovente. La sentencia sumaria se puede dictar a favor o en contra de la parte que la solicita, según proceda en Derecho. El propósito de este mecanismo procesal es "aligerar la tramitación de un caso permitiendo que se dicte sentencia sin necesidad de que se tenga que celebrar la vista en los méritos, cuando de los documentos no controvertidos que se acompañan con la solicitud surge que 'no existe una legítima disputa de hecho a ser dirimida

---

[4] Aunque el tribunal de instancia tuvo ante sí una moción de sentencia sumaria y una moción de desestimación, entendemos que lo que se dictó en este caso fue realmente una sentencia sumaria, pues a la moción de desestimación se incorporaron por referencia todas las alegaciones hechas en la moción de sentencia sumaria original y, por ende, todos los documentos presentados con ésta.

... sólo resta aplicar el derecho' ". *Corp. Presiding Bishop CJC of LDS v. Purcell*, supra, pág. 720. Véanse: *Marín v. American Int'l Ins. Co. of P.R.*, 137 D.P.R. 356 (1994); *Soto v. Hotel Caribe Hilton*, 137 D.P.R. 294 (1994); *Pilot Life Ins. Co. v. Crespo Martínez*, 136 D.P.R. 624 (1994).

"Como regla general, se dicta sentencia sumaria a base de los documentos admisibles en evidencia sometidos por el promoverte con su moción, los documentos sometidos por la parte promovida con su moción en oposición y aquellos que obran en el expediente del tribunal." *Medina v. M.S. & D. Química P.R., Inc.*, 135 D.P.R. 716, 726 (1994). La parte promovida solamente podrá derrotar la moción de sentencia sumaria presentando oposición acompañada con prueba admisible en evidencia que controvierta o rebata la evidencia afirmativa presentada por el promoverte, ya que en la sentencia sumaria no se dirime credibilidad. Íd., págs. 732–733.([5])

Ahora bien, por ser la sentencia sumaria un remedio discrecional, "[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de 'su día en corte', principio elemental del debido procedimiento de ley". *Roig Com. Bank v. Rosario Cirino*, 126 D.P.R. 613, 617 (1990). Así, pues, existen litigios y controversias que por su naturaleza no hacen deseable o aconsejable resolverlos mediante sentencia sumaria, porque difícilmente en tales casos el tribunal puede tener ante sí toda la verdad de los hechos a través de declaraciones juradas o deposiciones. *Soto v. Hotel Caribe Hilton*, supra, pág. 301, citando a *García López v. Méndez García*, 88 D.P.R. 363, 380 (1963).

A la luz de los principios expuestos, corresponde que analicemos si la prueba que tuvo ante sí el tribunal de instancia era suficiente para determinar sumariamente que la escritura de capitulaciones matrimoniales de los es-

---

([5]) Sobre el mecanismo de sentencia sumaria, véase J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Pubs. J.T.S., 2000, T. I, págs. 590–619.

posos Cruz-Arce era válida como cuestión de derecho y, además, concluir que no procedía imputarle ingresos al señor Cruz Dávila en virtud de su matrimonio con la señora Arce. Para hacer esta determinación es necesario examinar, en primer término, las disposiciones relacionadas con las capitulaciones matrimoniales, en conjunto con el derecho de alimentos de los hijos menores de edad.

## III

Nuestro ordenamiento reglamenta los efectos económicos del matrimonio respecto a los cónyuges y respecto a terceros. De esta forma se admiten las capitulaciones matrimoniales, que pueden definirse como el contrato celebrado entre los futuros cónyuges, con anterioridad al matrimonio, "con el fin casi exclusivo de fijar el régimen a que deben sujetarse los bienes del mismo". F. Fortuny Comaposada, *Régimen de bienes en el matrimonio: texto, jurisprudencia y comentarios*, Barcelona, Colección Nereo, 1962, pág. 9. El Art. 1267 del Código Civil, 31 L.P.R.A. sec. 3551, por su parte, dispone:

> Los que se unan en matrimonio podrán otorgar sus capitulaciones antes de celebrarlo, estipulando las condiciones de la sociedad conyugal relativamente a los bienes presentes y futuros, sin otras limitaciones que las señaladas en este título.

Como regla general y dentro del principio de autonomía de la voluntad que impera en nuestro sistema de contratación, las capitulaciones matrimoniales admiten toda clase de pactos. Sin embargo, en este contrato la autonomía de las partes no es absoluta, ya que están prohibidos los pactos que sean contrarios a la naturaleza y a los fines del matrimonio; que contravengan preceptos legales de carácter prohibitivo o imperativo, y que sean depresivos de la autoridad que corresponde respectivamente a los futuros cónyuges en la familia. Art. 1268 del Código Civil, 31

L.P.R.A. sec. 3552; *Domínguez Maldonado v. E.L.A.*, 137 D.P.R. 954, 960 (1995).

En las capitulaciones matrimoniales los futuros cónyuges pueden optar por: (1) la separación de los bienes pero con participación en ganancias; (2) la sociedad de gananciales, para lo cual basta con guardar silencio; (3) renunciar al régimen ganancial; (4) la total separación de bienes, o (5) elegir cualquier otro régimen que combine estas posibilidades, siempre que no infrinja las leyes, la moral o las buenas costumbres. De otra parte, los futuros esposos pueden pactar, además del régimen económico, acuerdos relativos a la gestión de cada uno de los cónyuges en sus bienes propios y la intervención en ellos del otro e, incluso, establecer donaciones por razón de matrimonio. *Umpierre v. Torres Díaz*, 114 D.P.R. 449, 460 (1983). Véanse: J. Castán Tobeñas, *Derecho civil español, común y foral*, 10ma ed. rev., Madrid, Ed. Reus, 1987, T. V, Vol. I, págs. 331–332; M. Albaladejo, *Compendio de Derecho Civil*, 3ra ed., Barcelona, Ed. Bosch, 1976, págs. 516–517.[6] *Hemos reconocido que aunque el propósito fundamental de realizar un pacto de capitulaciones es establecer el régimen económico que ha de imperar en el matrimonio, este tipo de contrato puede tener otras finalidades ajenas al régimen económico conyugal. Domínguez Maldonado v. E.L.A.*, supra, págs. 960–961.

La razón para que se reconozca cierta liberalidad en relación a la clase de pactos que pueden establecerse mediante capitulaciones matrimoniales es que nuestro Código Civil, aunque reconoce el régimen económico matrimonial de separación de bienes, no dispone expresamente cuales serán las reglas que se seguirán para atender las cargas

---

[6] Además, las capitulaciones pueden regular "los derechos de los esposos sobre sus bienes respectivos, los derechos sobre las ganancias realizadas por ellos durante su unión; los intereses de los hijos y de la familia; los intereses de los terceros que contraten con uno u otro de los esposos, y, en definitiva, el interés económico y social, muy afectado por la solución que se dé a los problemas que el régimen matrimonial lleva consigo". J. Castán Tobeñas, *Derecho civil español, común y foral*, 11ma ed., Madrid, Ed. Reus, 1987, T. V, Vol. I, pág. 309.

económicas del matrimonio en estos casos ni para disponer de los bienes en caso de disolución del matrimonio. Lo contrario ocurre en cuanto a la sociedad de gananciales, la cual está regulada extensamente por el Código Civil. Es por ello que al interpretar una escritura de capitulaciones matrimoniales, hay que examinar cuidadosamente aquellos acuerdos que los cónyuges han establecido para reglamentar su relación económica.

Lo anterior cobra fundamental importancia ante el hecho de que en nuestro ordenamiento aún impera el principio de inmutabilidad de las capitulaciones matrimoniales. Según éste, una vez celebrado el matrimonio, las capitulaciones no pueden ser modificadas, ni siquiera con el mutuo acuerdo de los cónyuges. Arts. 1271 y 1272 del Código Civil, 31 L.P.R.A. secs. 3555 y 3556. La vigencia de esta doctrina en nuestro ordenamiento ha dado lugar a varias controversias presentadas ante este Foro en las cuales uno o ambos cónyuges, que han otorgado capitulaciones matrimoniales, han querido establecer o probar que durante su matrimonio no han seguido tal régimen de separación de bienes.[7]

En *Domínguez Maldonado v. E.L.A.*, supra, un matrimonio presentó una solicitud de sentencia declaratoria para que el tribunal decretara que entre ellos existía una sociedad legal de gananciales, aunque habían otorgado capitulaciones matrimoniales en las cuales guardaron silencio con relación al régimen económico del matrimonio, pero indicaron que no regiría la sociedad legal de gananciales. En estas circunstancias resolvimos, de acuerdo con el principio de inmutabilidad, que cuando una pareja otorga un contrato de capitulaciones y expresamente pacta que no desea que surja el régimen ganancial, el hecho de que durante el matrimonio lleven a cabo actos de administración

---

[7] La doctrina de inmutabilidad de las capitulaciones ha sido desterrada de una gran parte de los códigos civilistas modernos.

y esfuerzo común, no genera entre dichos cónyuges una sociedad legal de gananciales.[8]

De otra parte, en *Umpierre v. Torres Díaz*, supra, atendimos el reclamo de una ex esposa que alegaba que entre ella y su ex cónyuge había surgido una sociedad legal de gananciales aun cuando éstos habían otorgado capitulaciones matrimoniales. En ese caso, de acuerdo con la evidencia presentada, reconocimos la existencia de una sociedad legal de gananciales ya que, contrario a *Domínguez Maldonado v. E.L.A.* supra, en la escritura de capitulaciones no se rechazó expresamente el régimen ganancial, como tampoco se estableció específicamente que existiría entre los cónyuges una total separación de bienes.

Como se puede apreciar, no ha sido tarea fácil para este Tribunal trazar los contornos del régimen económico de la separación de bienes durante el matrimonio cuando uno o ambos cónyuges han pretendido impugnar la validez de sus capitulaciones matrimoniales y los acuerdos establecidos en éstas.[9] Esta tarea se hace aún más difícil cuando, como en el caso de autos, se trata de una tercera persona, ajena al matrimonio y que no ha sido parte del contrato de capitulaciones, quien intenta impugnar la validez de éstas y establecer que en la realidad el matrimonio no ha seguido el régimen económico de separación de bienes pactado.

No es la primera vez que se presenta ante nos una controversia similar a la de autos. En *Cepeda Torres v. García Ortiz*, 132 D.P.R. 698 (1993), la señora Cepeda, ex esposa

---

[8] Finalmente, devolvimos el caso con instrucciones de que se celebrase una vista evidenciaria donde la señora Santiago pudiese presentar prueba de que entre ésta y su esposo existió una comunidad de bienes.

[9] Lo anterior quedó ejemplificado en el caso *Cruz Ayala v. Rivera Pérez*, 141 D.P.R. 44 (1996). En la citada decisión revocamos una sentencia dictada por el tribunal de instancia que resolvió que una propiedad adquirida durante el matrimonio entre la Sra. Yolanda Rivera Pérez y el Sr. José Cruz Ayala, quienes se habían casado bajo capitulaciones matrimoniales donde pactaron el régimen de separación de bienes, pertenecía únicamente al señor Cruz Ayala. En este caso no hubo opinión del Tribunal, ya que los jueces estaban divididos en cuanto a los fundamentos adecuados para revocar la sentencia recurrida.

del señor García, solicitó un aumento en la pensión alimentaria que éste pagaba. Como parte de ese procedimiento, se le cursó al señor García un interrogatorio mediante el cual se le solicitó información sobre los ingresos, los gastos y la ocupación de su nueva esposa, con la cual se había casado bajo capitulaciones matrimoniales y había establecido el régimen de separación de bienes. El señor García se negó a proveer dicha información aduciendo que ésta era inmaterial, pues había contraído matrimonio bajo capitulaciones matrimoniales y, además, su esposa no era parte en el procedimiento.

El foro de instancia concluyó que, aun existiendo separación de bienes, era menester contestar las preguntas del interrogatorio referentes a los ingresos de la nueva esposa, ya que ambos cónyuges eran responsables de los alimentos de los menores procreados en matrimonios anteriores. Inconforme, el señor García recurrió ante nos y señaló que el tribunal incidió al concluir que los ingresos de su nueva esposa tenían que ser considerados para determinar la cuantía de aumento de la pensión y que, además, él carecía de autoridad para representar a su esposa en el pleito, quien no había sido emplazada. Al resolver la controversia, no nos expresamos sobre si procedía o no incluir o tomar en consideración los ingresos de la nueva esposa, ya que concluimos que antes de hacer cualquier determinación sobre el particular, era necesario que ésta fuese emplazada, por ser parte indispensable. Así, pues, nuestra jurisprudencia no ha confrontado previamente la impugnación de unas capitulaciones matrimoniales por un tercero y, específicamente, cuando se alega que el contrato capitular menoscaba el derecho de una menor de edad de recibir alimentos.

IV

Sabido es que en nuestra jurisdicción la obligación de los progenitores de proveer alimentos a sus hijos se mani-

fiesta a la luz del derecho a la vida consagrado en el Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. Véase *Chévere v. Levis*, 150 D.P.R. 525 (2000). *La obligación de los padres de proveer alimentos a sus hijos menores está revestida del más alto interés público* y, por lo tanto, el Estado ha legislado ampliamente para asegurar su cumplimiento. *Martínez v. Rodríguez*, 160 D.P.R. 145 (2003); *López v. Rodríguez*, 121 D.P.R. 23, 28 (1988); *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61 (1987). Esta obligación incluye todo lo que es indispensable para el sustento, habitación, vestido y asistencia médica, según la posición social de la familia. Art. 142 del Código Civil, 31 L.P.R.A. sec. 561.

Existe una clara política pública de procurar que los padres o las personas legalmente responsables contribuyan a la manutención de sus hijos en la medida en que sus recursos se lo permitan. Véanse: Ley Orgánica de la Administración para el Sustento de Menores, Ley Núm. 5 de 30 de diciembre de 1986, según enmendada, 8 L.P.R.A. sec. 502; *Soto Cabral v. E.L.A.*, 138 D.P.R. 298 (1995). El deber de alimentar, educar y criar a los hijos menores es producto de ser padre o madre, y se origina desde el momento en que la paternidad o maternidad quedan establecidas. *Chévere v. Levis*, supra; *Chévere Mouriño v. Levis Goldstein*, 152 D.P.R. 492 (2000).

La obligación de los padres de proveer alimentos a sus hijos tiene esencialmente dos fuentes estatutarias en el Código Civil. Una de ellas surge del Art. 153 (31 L.P.R.A. sec. 601), que establece como parte de los deberes y las obligaciones del padre y de la madre el alimentar a sus hijos menores. Este deber no depende del estado de necesidad del hijo, sino que emana directamente del hecho de la paternidad o maternidad y se ha interpretado como parte del conjunto de derechos y obligaciones que emanan de la patria potestad. *Chévere v. Levis*, supra. La segunda fuente de los alimentos para los hijos menores de edad

surge del Art. 143 (31 L.P.R.A. sec. 562), que dispone que los ascendientes y descendientes están obligados a darse alimentos. Esta obligación no requiere que el hijo sea menor de edad. En tales casos, el derecho a recibir alimentos se fundamenta en el estado de necesidad del hijo y depende de la condición económica del padre alimentante. *Chévere v. Levis*, supra.

De otra parte, el Art. 1308 del Código Civil, 31 L.P.R.A. sec. 3661, impone *a la sociedad de bienes gananciales* la obligación de velar por "[e]l sostenimiento de la familia y la educación de los hijos comunes *y de cualquiera de los cónyuges*". (Énfasis suplido.) Más aún, cualquier nueva sociedad de gananciales que se cree será responsable del sustento y de los alimentos de los hijos menores de edad habidos en un matrimonio anterior de alguno de sus componentes. En consecuencia, cuando cualquiera de los padres constituye un nuevo matrimonio bajo el régimen ganancial, el tribunal, al fijar o de alguna manera modificar una pensión alimentaria que deba pagar uno de los cónyuges, deberá tomar en consideración la capacidad económica de la nueva sociedad conyugal, ya que se puede presumir, razonablemente, que bajo el régimen ganancial el padre o la madre que se ha casado se beneficiará de los ingresos y bienes adquiridos por la sociedad o su cónyuge. Art. 145 del Código Civil, 31 L.P.R.A. sec. 564; *López v. Rodríguez*, supra, págs. 30–31. A tenor con lo anterior, hemos resuelto que cuando los padres se separan o divorcian, la obligación de alimentar a los hijos menores *es personal de cada uno de los ex cónyuges y la deberán satisfacer de su peculio, a excepción de aquellos casos en que el padre o la madre alimentante contraiga nuevas nupcias. En ese caso, la obligación será imputable a la nueva sociedad de gananciales que se haya constituido. Figueroa Robledo v. Rivera Rosa*, 149 D.P.R. 565, 578 (1999).

Ahora bien, el pacto de una pareja de establecer la separación de sus bienes mediante capitulaciones matrimo-

niales tiene el efecto de que con el subsiguiente matrimonio *no surge una sociedad legal de bienes gananciales* sobre la cual pueda recaer la responsabilidad económica por los alimentos de los hijos de uno de los cónyuges.[10] Sobre el particular, en la doctrina española se ha expresado que en el régimen de separación de bienes ninguno de los hijos de uno sólo de los cónyuges está incluido dentro de las cargas del matrimonio, entendiendo que "es congruente con la economía de separación la aplicación pura y simple de los preceptos sobre alimentos entre ascendientes y descendientes *que no conocen ningún caso de deuda alimenticia entre parientes por afinidad*". (Énfasis suplido.) J. Delgado Echevarría, *El régimen matrimonial de separación de bienes en Cataluña*, Madrid, Ed. Tecnos, 1974, pág. 177.

Algunos se han planteado si esto sucederá siempre o si debe dársele alguna consideración al hecho de si los hijos de uno de los cónyuges conviven o no en el hogar familiar.[11] De acuerdo con Puig Ferriol y Roca Trías, los gastos de mantenimiento de los hijos de uno de los cónyuges corren por cuenta de éste aunque convivan en compañía del matrimonio, de tal manera que si un cónyuge concurre con los gastos respecto a los hijos de otro, adquiere un crédito contra él. Puig Ferriol y Roca Trías, *Fundamentos del Derecho Civil en Cataluña: derecho familiar catalán*, Barcelona, Ed. Bosch, 1979, T. II, pág. 125. Otros tratadistas opinan que el mantenimiento y la educación de los hijos de uno sólo de los cónyuges que conviven en el hogar,

---

[10] El régimen de separación de bienes se produce cuando cada uno de los cónyuges tiene sus propios bienes, por lo que no existe ningún tipo de unión, confusión o comunidad. "En la separación de bienes hay un patrimonio privativo del marido y otro privativo de la mujer, separados entre sí. A cada cónyuge le pertenece la propiedad, el disfrute, la administración y la disposición de sus propios bienes." L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 5ta ed., Madrid, Ed. Tecnos, 1989, Vol. IV, pág. 229. Véase, además, J.O. Azpiri, *Derecho de Familia*, Buenos Aires, Ed. Hammurabi, 2000, pág. 141.

[11] Nótese que, según el Art. 1362 del Código Civil español, "[l]a alimentación y educación de los hijos de uno solo de los cónyuges correrá a cargo de la sociedad de gananciales cuando convivan en el hogar familiar. En caso contrario, los gastos derivados de estos conceptos serán sufragados por la sociedad de gananciales, pero darán lugar a reintegro en el momento de la liquidación".

aun mediando el régimen de separación de bienes, se debe considerar una carga del matrimonio a la que ambos cónyuges están obligados a contribuir. Delgado Echevarría, *op. cit.*, pág. 351. Sin embargo, se considera que "[s]i los hijos no conviven en el hogar familiar, ... su sostenimiento y educación estará a cargo exclusivamente [d]el cónyuge progenitor ...". Á.L. Rebolledo Valera, *La separación de bienes en el matrimonio: el régimen convencional de separación de bienes en el Código Civil*, Madrid, Ed. Montecorvo, 1983, pág. 374.

Este tema también ha sido objeto de alguna discusión en Puerto Rico. Se ha señalado que una de las razones —posiblemente la principal— que tienen los futuros consortes para otorgar capitulaciones matrimoniales es, precisamente, que el nuevo cónyuge no responda por las deudas alimentarias del otro y que cláusulas en este sentido deben ser declaradas contrarias al orden público. M. Fraticelli Torres, *Un nuevo acercamiento a los regímenes económicos en el matrimonio: la sociedad legal de gananciales en el Derecho puertorriqueño*, XXIX (Núm. 2) Rev. Jur. U.I.P.R. 413, 434 y 500–501 (1995). Es necesario poner en perspectiva estas expresiones.

De entrada, debemos reconocer que nuestro ordenamiento permite al nuevo cónyuge que no desea ver comprometido su patrimonio con las deudas del otro cónyuge, incluso las alimentarias, la alternativa de no contraer matrimonio bajo el régimen de sociedad legal de gananciales. En lo que aquí nos concierne, es decir, en la responsabilidad del nuevo matrimonio casado bajo el régimen de separación de bienes por los alimentos que deba satisfacer uno de los cónyuges a favor de sus hijos menores que no conviven en el hogar del nuevo matrimonio, y a la luz de lo que hasta ahora hemos discutido, debemos concluir que la separación de bienes y el repudio a la sociedad de gananciales trae como consecuencia que la deuda de alimentos de uno de los cónyuges respecto a sus hijos se

mantenga como de carácter privativo y exclusivo de dicho padre o madre, *que éste debe satisfacer de su patrimonio.*

Lo anterior no es, de por sí, contrario al orden público, pues el ordenamiento impone la responsabilidad principal por los alimentos de los menores al padre y a la madre, y en cuanto a esta obligación el nuevo cónyuge es un tercero.[12] Si éste quiere asumir dicha obligación alimentaria, así puede hacerlo optando por el régimen de la sociedad legal de gananciales, pero si ese no es su deseo, el ordenamiento permite separar su patrimonio del de su cónyuge alimentante.

Sin embargo, *como cuestión de política pública, no podemos perder de perspectiva que las deudas en concepto de alimentos tienen un carácter especial, en virtud de la protección debida a los menores y el deber de sus padres de proveerles alimentos con arreglo a su fortuna.* La declaración de política pública de la Ley Núm. 5, *supra*, indica:

> El incumplimiento de las obligaciones morales y legales por parte de uno o ambos padres para con sus hijos constituye uno de los problemas más apremiantes en nuestra sociedad. Causas de este problema lo son el deterioro de los valores sociales, la desintegración de la unidad familiar, el aumento en el número de niños nacidos fuera del matrimonio, el alto número de divorcios y el desempleo.
>
> *Ante el grave problema del incumplimiento de la obligación alimentaria hacia los hijos es necesario poner en vigor una política pública de paternidad responsable.* Además, es posible hacerlo porque, en la mayoría de los casos, el padre incumplidor tiene la capacidad económica para satisfacer su obligación. (Énfasis suplido.) 8 L.P.R.A. sec. 502.

---

[12] Es importante destacar que el derecho de alimentos en nuestro ordenamiento está fundamentado en relaciones de parentesco, por lo cual no se reconoce tal derecho entre terceros o parientes por afinidad. Cónsono con lo anterior, la obligación de alimentar se impone al *padre y madre* con respecto a sus hijos; los ascendientes y descendientes; los cónyuges *entre sí*; los hermanos, y en este último caso sólo cuando el alimentista no pueda procurarse medios para su propia subsistencia por causas no imputables a éste. Debido a que no existe una obligación de alimentar entre terceros que no están unidos por vínculos de parentesco, no es contrario a la moral y al orden público el hecho que esa tercera persona no desee alimentar a otra con la cual no se tiene una relación familiar. Nada impide que se plasme tal voluntad en un contrato de capitulaciones matrimoniales.

En atención al alto interés público del que está reves-
tido el derecho de alimentos de los hijos menores de edad,
la reclamación de un menor alimentista a los efectos de
que su padre o madre que se ha casado bajo capitulaciones
realmente no sigue el régimen de separación de bienes, se
debe analizar con mucha cautela. No se trata de que los
futuros cónyuges no puedan pactar que sólo el padre o la
madre se hará cargo de la deuda alimentaria con respecto
a los hijos propios, sino de *evitar que el pacto de separación
de bienes tenga realmente el único propósito de que el otro
cónyuge evada una posible responsabilidad por alimentos*,
mientras que en realidad los nuevos cónyuges, con respecto
a todas sus demás deudas y la administración de todos sus
bienes, se conduzcan realmente como una sociedad legal de
gananciales, la cual, de ordinario, sí es responsable por los
alimentos de los hijos de cualquiera de los cónyuges. Den-
tro de este contexto, debe reconocérsele al alimentista un
derecho a inquirir sobre si los nuevos esposos siguen real-
mente el régimen de separación de bienes pactado.[13] *En
tales casos el tribunal debe auscultar cuál es el régimen que
realmente existe entre la pareja, a los fines de asegurarse
que las capitulaciones matrimoniales no son un subterfugio
para que el padre o la madre alimentante se libere en al-
guna proporción de su obligación alimentaria por el hecho
de que las capitulaciones contengan pactos que tengan el*

---

[13] Por supuesto, quien ataca la validez de un contrato de capitulaciones ma-
trimoniales y la realidad fáctica de los acuerdos allí establecidos tiene el peso de la
prueba para convencer al juzgador de lo contrario. Para esto el alimentista tiene a su
disposición los mecanismos de descubrimiento de prueba dispuestos en las Reglas de
Procedimiento Civil. Por su parte, el alimentante casado bajo capitulaciones matri-
moniales y su cónyuge, si lo estiman necesario, podrán oponerse a dicho descubri-
miento si entienden que la información solicitada es privilegiada o la materia a
descubrirse no es pertinente al asunto en controversia. Regla 23.1(a) de Procedi-
miento Civil, 32 L.P.R.A. Ap. III. El alimentante también tendrá a su disposición el
mecanismo de la orden protectora, en caso que el descubrimiento constituya "hosti-
gamiento, perturbación u opresión, así como de cualquier gasto o molestia
indebid[a]". Regla 23.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III. De igual forma,
como el descubrimiento de prueba no es ilimitado, el tribunal podrá en casos como
éstos, al igual que en cualquier litigio civil, limitar el alcance y los mecanismos de
descubrimiento de prueba que utilizará, siempre que con ello se adelante la solución
de las controversias de forma rápida, justa y económica.

*propósito deliberado o el efecto de reducir su capacidad para cumplir con la obligación alimentaria preexistente.*

Conviene indicar que una determinación a los efectos de que existe realmente un régimen de separación de bienes y, por consiguiente, el cónyuge no alimentante no será responsable con su patrimonio por la deuda de alimentos del otro, no necesariamente excluye la posibilidad de que puedan tomarse en cuenta los ingresos de *ambos cónyuges* al determinar el monto de la pensión alimentaria a concederse en beneficio del hijo de uno de éstos.

Recuérdese que los padres tienen el deber de alimentar a sus hijos menores *con arreglo a su fortuna.* Podría darse el caso de que un padre o madre obligado a alimentar a un hijo contraiga nupcias bajo el régimen de separación de bienes, pero que, en virtud de ese matrimonio, como cuestión de realidad, el alimentante se vea relevado de toda una serie de responsabilidades económicas por el hecho de que el otro cónyuge se haga cargo de éstas. En tales casos, el padre o la madre obligado a prestar alimentos estaría obteniendo un beneficio o alivio económico sustancial y al hijo alimentista se le debe reconocer un derecho a participar de esos beneficios. También podría ocurrir que, aunque exista la separación de bienes, el cónyuge alimentante sea el que tenga la responsabilidad económica mayor por las cargas del matrimonio, de manera que la distribución de las responsabilidades económicas resulte irrazonable y tenga el efecto de empobrecer el patrimonio del alimentante. En estos casos, los tribunales deberán evaluar cuidadosamente las alegaciones y la evidencia que tenga ante sí de manera que se protejan adecuadamente los derechos del alimentista. Repetimos que lo esencial es asegurar que los acuerdos de la nueva pareja no tengan el efecto ni el propósito de reducir la capacidad del alimentante para cumplir con su obligación de proveer alimentos a un hijo menor de edad habido en una relación anterior.

A la luz de lo expuesto anteriormente, corresponde que analicemos los hechos del caso de marras.

## V

En su primer planteamiento, la recurrente alega que, como cuestión de derecho, la escritura de capitulaciones matrimoniales es nula en su forma y contenido, esencial-mente porque extiende la aplicación de sus cláusulas a la relación pre y post matrimonial del señor Cruz y la señora Arce; contiene cláusulas contradictorias entre sí, y exime expresamente a la señora Arce de la responsabilidad ali-mentaria por la menor aquí concernida. La señora Maldo-nado alega que es necesaria la celebración de una vista evidenciaria para resolver este particular.

No le asiste la razón. Aunque las capitulaciones matri-moniales son un contrato que está dirigido principalmente a regular el régimen económico matrimonial, esto no im-pide que se disponga en ellas para otro tipo de arreglos, que pueden incluir acuerdos pre matrimoniales y post divorcio. Se trata de asuntos que la pareja ha preferido consignar en la escritura de capitulaciones. Nada hay en derecho que impida tales pactos, siempre que no sean con-trarios a las leyes, a la moral o al orden público.

Por otra parte, las cláusulas G(10) e I de la escritura de capitulaciones matrimoniales, en las que se establece que el señor Cruz Dávila será el único responsable por la deuda alimentaria de su hija con la señora Maldonado, tampoco son nulas *de su faz*, a tenor del análisis precedente en esta opinión. No obstante, la efectividad de aquella parte de la cláusula I en la cual se dispone que "bajo ningún concepto podrán tomarse o computarse los bienes e ingresos de la [señora Arce] para determinar la capacidad de pago del [señor Cruz Dávila] en cualquier aportación futura que venga obligado a satisfacer por concepto de alimentos, ya

sea para los hijos o para cualquier ex cónyuge" estaría sujeta al escrutinio judicial sobre la verdadera relación existente entre los cónyuges. Veamos.

La señora Maldonado alegó que en las circunstancias del presente caso, era necesaria la celebración de una vista evidenciaria para determinar si realmente existe entre el matrimonio Cruz-Arce el régimen de separación de bienes o una sociedad legal de gananciales que invalidaría las capitulaciones. Para justificar la necesidad de esa vista, la señora Maldonado hace referencia a: (1) las planillas de información económica que sometió el señor Cruz Dávila y la señora Arce a principios de 1997, y (2) las cláusulas de la escritura donde se consignan las aportaciones que hará uno y otro cónyuge al hogar familiar. De las planillas de información económica que rindieron el señor Cruz Dávila y la señora Arce surge que éste tenía unos gastos médicos y de otra índole que eran similares a los reportados por la señora Arce en su correspondiente planilla.[14] Por su parte, la señora Arce indicó en su planilla que era estudiante y la totalidad de sus gastos los sufragaba su esposo.

Según la señora Maldonado, la coincidencia en los gastos de uno y otro cónyuge, y el hecho de que el señor Cruz Dávila, al menos durante 1996, aparentemente pagó los gastos de su esposa por ésta ser estudiante, sugiere la existencia de una sociedad legal de gananciales o, al menos, una comunidad de bienes.

Para atender este planteamiento es necesario indicar que el hecho de que una pareja casada bajo separación de bienes reporte unos gastos similares, no significa que no siguen la separación de bienes. Más bien, refleja que am-

---

[14] Por ejemplo, el señor Cruz Dávila indicó que sus gastos de laboratorios eran aproximadamente diez dólares mensuales, mientras que su esposa reportó gastos en el mismo concepto de veinte dólares mensuales. En deducibles médicos ambos reportaron un gasto de diez dólares mensuales. En medicinas el señor Cruz Dávila y la señora Arce reportaron veintinueve y cuarenta dólares, respectivamente. En gastos de entretenimiento cada uno reportó doscientos dólares.

bos tienen un nivel de vida y gastos similares, lo cual no es extraño en la vida en pareja. Por otra parte, en el caso específico de los esposos Cruz-Arce, el hecho de que durante el 1996 aparentemente el señor Cruz Dávila cubría los gastos de su esposa, tampoco tiene la consecuencia de convertir su matrimonio en una sociedad de gananciales. De hecho, los esposos Cruz-Arce consideraron la posibilidad de que en algún momento uno de ellos tuviese que hacerse cargo de los gastos del otro. A estos efectos estipularon, en la cláusula H de la escritura, que "únicamente mientras dure su matrimonio, [y] en la eventualidad de que uno de ellos se enferme de cama o quede temporeramente incapacitado o imposibilitado de generar suficientes ingresos para satisfacer su aportación al hogar conyugal, el otro asumirá esa responsabilidad hasta tanto cese el impedimento o la incapacidad del primero". Apéndice de la Petición de *certiorari*, pág. 182.

Como se puede notar, aunque no se menciona específicamente el asumir los gastos de un cónyuge mientras el otro esté estudiando, la cláusula citada puede razonablemente aplicarse a esta situación, ya que todo parece indicar que los estudios de la señora Arce imposibilitaban, al menos para 1996, que ésta hiciera mayores aportaciones al hogar conyugal. Dicha asunción de gastos por parte del señor Cruz Dávila, que pudo haber sido temporal, no significa de por sí que los esposos Cruz-Arce incumplen con el régimen económico pactado.

Sin embargo, la recurrida señala que de acuerdo con la escritura de capitulaciones, la señora Arce hará aportaciones al hogar familiar, por lo que "al alimentante ha[brá] de imputársele un ahorro en sus gastos ... propios". Petición de *certiorari*, pág. 16. Por otra parte, también alega que "[e]n la medida en que el alimentante aporta al sostenimiento del hogar conyugal, según la Escritura aludida, se está empobreciendo su patrimonio ... disponible [y que l]a

medida y el alcance de la imputación de ingresos aquí planteada es pertinente a la investigación de la verdadera situación económica ...". Íd.

Al analizar la escritura de capitulaciones, encontramos que ésta efectivamente establece las cargas del hogar de las cuales se hará cargo uno y otro cónyuge con sus respectivos ingresos. Por ejemplo, en la cláusula F se indica que la señora Arce se hará cargo de la compra de comestibles y alimentos, los cargos de electricidad, agua, teléfono y cable, y los gastos de jardinería y reparaciones del hogar, mientras que el señor Cruz Dávila se hará cargo de los gastos personales y de ropa de ambos cónyuges, hipoteca, renta, mensualidad de la casa en que ambos residan, así como reparaciones y mejoras a ésta, además de los gastos de entretenimiento y viaje, entre otros extremos.

Consideramos, en principio, que este tipo de acuerdos son parte de la vida en común de la pareja que reflejan la manera en que ésta ha decidido organizarse económicamente. Por lo tanto, no se puede deducir de éstos, sin más, que los esposos Cruz-Arce no han seguido el régimen económico de separación de bienes. Se trata simplemente de una consignación en la escritura de las deudas y cargas del hogar por las cuales será responsable cada uno de los cónyuges.

No obstante, la particular división de las cargas económicas del matrimonio Cruz-Arce sugiere que podría ser el señor Cruz Dávila quien ha asumido la mayor parte de los gastos del matrimonio y del hogar o, al menos, los de mayor envergadura. En estas circunstancias, entendemos que el tribunal no tuvo ante sí toda la verdad para poder adjudicar con la totalidad de los elementos la reclamación relativa a la imputación de ingresos, máxime cuando el señor Cruz Dávila se ha opuesto al aumento de pensión solicitado. Por lo anterior, ni el foro primario ni el apelativo contaron con todos los elementos para determinar si los acuerdos de la pareja han tenido el efecto o el propósito de

menoscabar la capacidad económica del señor Cruz Dávila, en alguna medida, para cumplir su obligación alimentaria. De ser tal la situación, las capitulaciones no podrían ser validadas.

En atención a las anteriores circunstancias, era improcedente resolver sumariamente el presente caso. Por el contrario, debía permitírsele a la alimentista auscultar la distribución de responsabilidades económicas del matrimonio y el efecto de ésta, si alguno, sobre el patrimonio a disposición del padre alimentante para atender las necesidades de ésta. Al adjudicar un reclamo de alimentos de un hijo menor de edad los tribunales no podemos aplicar fórmulas aritméticas de forma automática o preceptos estatutarios sin indagar responsablemente sobre el posible menoscabo del derecho de alimentos que cobija al menor. Validar automáticamente tales capitulaciones constituiría, además, una actuación en abierta contravención a la política pública que existe en nuestro país de asegurar que los padres y las madres alimentistas cumplan con este deber responsablemente. No podemos suscribir el curso de acción que sigue la mayoría de aplicar unos preceptos legales de forma técnica, de espaldas al hecho que posiblemente la verdadera relación económica del nuevo matrimonio podría afectar en la práctica al alimentante para cumplir con su obligación.

En vista de los fundamentos antes expuestos, revocaríamos y devolveríamos el caso al foro de instancia para que celebre una vista evidenciaria sobre este particular con la intervención de la señora Arce como parte indispensable.