Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| EVOLUTION SERVICES GROUP, LLC<br><br>*Apelado*<br><br>v.<br><br>CBL REALTY SE<br><br>*Apelante* | KLAN202400628 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.:<br>SJ2022CV09882 (504)<br><br>Sobre:<br>Daños y otros |

Panel integrado por su presidenta, la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 7 de octubre de 2024.

Comparece ante nos CBL Realty SE (CBL o parte apelante) mediante recurso de *Apelación* y nos solicita la revisión de la *Sentencia Parcial*[1] emitida el 4 de marzo de 2024, notificada el 6 de marzo del mismo año, por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI o foro primario). Mediante el aludido dictamen, el foro primario declaró Ha Lugar la demanda y la solicitud de sentencia sumaria presentada por Evolution Services Group, LLC (ESG o parte apelada).

El 20 de marzo de 2024, CBL instó una *Moción Solicitando Determinaciones de Hecho[s] Adicionales y Moción de Reconsideración* y, el 21 de marzo de 2024, ESG presentó *Moción en Solicitud de Reconsideración*. Ambas fueron declaradas No Ha Lugar.

Por los fundamentos que expondremos a continuación, ***revocamos*** el dictamen apelado.

---

[1] Apéndice del recurso, págs. 226-237.

Número Identificador
SEN2024_____

**I.**

Surge del expediente apelativo que, el 1 de mayo de 2021, ESG suscribió un acuerdo de servicios profesionales (el Acuerdo[2]) con CBL, mediante el cual acordaron la prestación de servicios de limpieza y mantenimiento a la propiedad de la parte apelante. Los servicios serían facturados a razón de $830.00 mensuales, equivalentes a $9,960.00 anuales. Además, el Acuerdo sería efectivo por doce (12) meses, con una cláusula de renovación automática[3] por el mismo periodo de tiempo. En síntesis, dicha cláusula[4] dispone lo siguiente:

> 4. <u>Términos y Condiciones del Acuerdo</u>
> 4.1 Este Acuerdo de servicio comenzará en la fecha antes acordada, y permanecerá en vigor por un periodo de doce (12) meses. Después de los doce (12) meses este acuerdo se renovará automáticamente anualmente por el mismo periodo de meses. El CLIENTE puede cancelar esta auto renovación de doce (12) meses, enviando una carta certificada que cancela la renovación automática treinta (30) días antes de cualquier aniversario.

Esta cláusula permitía que CBL cancelara la renovación automática notificando a ESG por correo certificado, treinta (30) días antes del 1 de mayo de 2022.

Por otro lado, la cláusula 5.1[5] del Acuerdo estipulaba que:

> 5. <u>Cancelación</u>
> 5.1 Si el CONTRATISTA no cumple con sus obligaciones, el CLIENTE puede objetar incumplimiento a través de una carta al CONTRATISTA por correo certificado, especificando el fallo. Ese aviso le dará quince (15) días hábiles al CONTRATISTA para remediar y corregir las fallas reportadas. Si las fallas notificadas no son corregidas en ese periodo, el Cliente tendrá derecho a cancelar este acuerdo mediante notificación por escrito y dando un plazo de treinta (30) días de calendario para la cancelación.

Esto es, si ESG incumplía con sus obligaciones, la parte apelante podía objetar tal incumplimiento mediante una carta remitida por correo certificado especificando el fallo. A partir de dicho aviso, ESG contaría con quince (15) días para remediar y

---

[2] Apéndice del recurso, págs. 98–103.
[3] Cláusula 4.1 del Acuerdo. Véase apéndice del recurso, pág. 101.
[4] *Íd.*
[5] Apéndice del recurso, pág. 101.

corregir las fallas reportadas. Si estas no eran subsanadas, CBL tendría derecho a cancelar el Acuerdo a través de una notificación por escrito, brindando un término de treinta (30) días para la cancelación.

Además, la cláusula 5.2 del referido Acuerdo disponía lo siguiente:

> Si el CLIENTE cuenta con dos (2) meses de atraso, el CONTRATISTA suspenderá los servicios a prestarse y dará por cancelado este Acuerdo, pudiendo el CONTRATISTA reclamar el término restante del Acuerdo y cualquier otra cantidad debida, incluyendo, pero sin limitaciones, el pago [de] gastos, honorarios y costos del abogado incurridos en el proceso[6].

Así las cosas, el 22 de abril de 2022, CBL, representado por Vionette Benítez Quiñones, envió una comunicación por correo electrónico[7] dirigida a ESG para informar la cancelación del Acuerdo, efectivo el 1 de mayo de 2022. El correo electrónico no indicaba las razones por las cuales CBL exigía la cancelación. Posteriormente, el 27 de abril de 2022, la parte apelante remitió una segunda carta[8] a ESG, a través de correo certificado. En esencia, CBL expresó que la cancelación del Acuerdo surgía como resultado de alegadas deficiencias, las cuales persistieron durante todo el periodo de servicio. Además, la parte apelante llamó a la atención un "evento serio"[9] ocurrido con uno de los empleados de ESG. Finalmente, hizo referencia a una conducta "irrespetuosa, poco tolerante y desafiante"[10] por parte del presidente de ESG, el señor Jesús Fadul, la cual empeoraba la comunicación entre las partes.

En respuesta, el 2 de mayo de 2022, el señor Jesús Fadul, en representación de ESG, contestó la comunicación recibida. A través de su escrito[11], este advirtió a la parte apelante que las

---

[6] Apéndice del recurso, pág. 102.
[7] Apéndice del recurso, pág. 107.
[8] Apéndice del recurso, págs. 108-109.
[9] Apéndice del recurso, pág. 109.
[10] *Íd.*
[11] Apéndice del recurso, págs. 110-113.

comunicaciones enviadas para la cancelación del Acuerdo eran deficientes e incumplían con lo dispuesto en la cláusula 5.1. Precisó, que no había recibido una carta certificada notificando deficiencias en el servicio, conforme establece la referida cláusula. Añadió que, la primera carta del 22 de abril de 2022 no exponía nada sobre el tema.

Sobre la situación con el empleado, esbozó que la compañía aplicó sus protocolos internos y realizó una investigación, lo que posteriormente culminó en que CBL permitiera que el empleado proveyera los servicios nuevamente. Por otro lado, adujo que, durante la llamada telefónica entre ambas partes, se le había indicado que la razón de la cancelación respondía a que ahora CBL deseaba los servicios únicamente en las áreas comunes, y con menor frecuencia. Indicó, además, que ello demostraba que la parte apelante pretendía enmendar el Acuerdo, por lo que canceló el mismo inmediatamente y sometió a cobro el restante término. Por último, adujo que, de no recibir el pago, estaría presentando una reclamación judicial.

Al siguiente día, 3 de mayo de 2022, CBL respondió a la parte apelada, reconociendo su inobservancia a las cláusulas reseñadas[12]. No obstante, arguyó que ESG no podía cancelar el Acuerdo y pretender cobrar un año completo sin brindar servicio alguno. Debido a ello, presentó la alternativa de un Acuerdo a término fijo de un (1) año, sin renovación automática, condicionado a una serie de factores.

El 5 de mayo de 2022, ESG replicó[13] rechazando la propuesta realizada por CBL, puesto que "[l]as condiciones que exigen para rectificar no van acorde a nuestras políticas o modo de operar de la

---

[12] Apéndice del recurso, págs. 114-118.
[13] Apéndice del recurso, págs. 119-121.

compañía"[14]. Además, señaló lo siguiente: "el "acuerdo" entre las partes, es la herramienta que tenemos para poder cancelar el contrato y cobrar el t[é]rmino restante sin estar obligados a dar más servicio siendo que el cliente es el que está en incumplimiento"[15].

Así pues, el 9 de noviembre de 2022, ESG instó una *Demanda*[16] sobre incumplimiento de contrato contra CBL. Por medio de esta, sostuvo que CBL canceló el Acuerdo unilateralmente, contrario a lo que estipulan sus cláusulas. Adujo que la parte apelante no le notificó mediante correo certificado la falla en alguno de los servicios, ni le envió una notificación treinta (30) días antes del 1 de mayo de 2022 para que el Acuerdo no se renovara automáticamente. Por todo esto, ESG solicitó la suma de $13,562.76, equivalente al año de servicio en curso.

El 15 de diciembre de 2022, CBL compareció mediante *Contestación a Demanda*[17]. A través de esta, alegó afirmativamente que aun cuando había intentado cancelar el Acuerdo durante el mes de abril de 2022, luego aceptó continuar con el mismo. Manifestó que nunca solicitó la enmienda al Acuerdo, sino que solicitó unos servicios sustitutos para el nuevo año. De igual forma, expresó que no venía obligada a pagar la cantidad exigida, puesto que se estaba ante un caso de excepción de contrato no cumplido (*exceptio non adimpleti contractus*), de conformidad al Artículo 1253 del Código Civil de Puerto Rico, 31 LPRA sec. 9821. Asimismo, arguyó que no incumplió con el Acuerdo, toda vez que aceptó no haber cumplido con las disposiciones contractuales pactadas por lo que se extendía el mismo hasta el 1 de mayo de 2023. Manifestó que únicamente ejerció su derecho a notificar asuntos que debían ser atendidos por ESG.

---

[14] Apéndice del recurso, pág. 119.
[15] *Íd.*
[16] Apéndice del recurso, págs. 1-4.
[17] Apéndice del recurso, págs. 5-11.

Por otro lado, CBL explicó que el Acuerdo establecía un único método de cancelación por parte del contratista, a saber, el atraso de dos (2) meses de pagos por el cliente. En atención a ello, sostuvo que la cancelación de ESG fue unilateral, por lo que no tenía derecho a reclamar la cuantía correspondiente al término del 1 de mayo de 2022 al 30 de abril de 2023.

Tras varios trámites procesales, el 31 de marzo de 2023, ESG presentó *Moción en Solicitud de Sentencia Sumaria*[18]. Adujo que existían catorce (14) hechos sobre los cuales no había controversia sustancial. Insistió en que el Acuerdo contenía cláusulas que disponían expresamente la manera en que este podía cancelarse, y que CBL no cumplió con ellas. De modo que, la parte apelante había incurrido en un incumplimiento contractual.

El 5 de abril de 2023, CBL instó *Moción en Contestación a Moción de Sentencia Sumaria y Solicitud para que se dicte Sentencia Sumaria a favor de CBL Realty S.E.*[19]. La parte apelante hizo referencia a los hechos esbozados por ESG, sobre los cuales entendía que sí había controversia, y propuso diez (10) hechos incontrovertidos. De otro lado, reprodujo los planteamientos esbozados en su alegación responsiva, en torno a la doctrina de *exceptio non adimpleti contractus*.

Evaluadas las mociones presentadas por las partes, el 4 de marzo de 2024, notificada el 6 de marzo del 2024, el TPI emitió *Sentencia Parcial*[20], en la que declaró Ha Lugar tanto la *Demanda* como la solicitud de sentencia sumaria presentada por ESG. El foro primario estableció las siguientes determinaciones de hechos:

1. El 28 de abril de 2021, –con efectividad el 1 de mayo de 2021– Evolution Services y CBL Realty suscribieron el "Acuerdo de Servicios" mediante el cual pactaron que Evolution Services, –en función de contratista– prestaría servicios de limpieza y mantenimiento a la propiedad de

---

[18] Apéndice del recurso, págs. 71-125.
[19] Apéndice del recurso, págs. 126-225.
[20] Apéndice del recurso, págs. 226-237.

CBL Realty a cambio de honorarios mensuales de $830.00 y un monto total contractual de $9,960.00.

a. La cláusula 4.1 dispone que el acuerdo permanecerá en vigor por un periodo de doce meses y que: "Después de los doce (12) meses este acuerdo se renovará automáticamente anualmente por el mismo periodo de meses. [CBL Realty] puede cancelar esta auto renovación de doce (12) meses, enviando una carta certificada que cancela la renovación automáticamente treinta (30) días antes de cualquier aniversario".

b. La cláusula 5.1 establece que:
Si [Evolution Services] no cumple con sus obligaciones, [CBL Realty] puede objetar incumplimiento a través de una carta a ESG por correo certificado, especificando el fallo. Ese aviso le dará quince (15) días hábiles a Evolution Services para remediar y corregir las fallas reportadas. Si las fallas notificadas no son corregidas en ese periodo, [CBL Realty] tendrá derecho a cancelar ese Acuerdo mediante notificación por escrito y dando un plazo de treinta (30) días de calendario para la cancelación.

c. Por otra parte, la cláusula 5.2 expone que:
Si el CLIENTE cuenta con dos (2) meses de atraso, el CONTRATISTA suspenderá los servicios a prestarse y dará por cancelado este Acuerdo, pudiendo el CONTRATISTA reclamar el término restante del Acuerdo y cualquier otra cantidad debida, incluyendo, pero sin limitaciones, el pago de gastos, honorarios y costos del abogado incurridos en el proceso.

2. El 22 de abril de 2022, Vionette Benítez Quiñones, en representación de CBL Realty, (en adelante, "Sra. Benítez") envió una carta a Jesús A. Fadul Castro, presidente de Evolution Services, (en adelante, "Sr. Fadul"), en la que le notificó la cancelación del acuerdo suscrito con Evolution Services, efectivo el 1 de mayo de 2022.

3. El 27 de abril de 2022, la Sra. Benítez le remitió otra carta al Sr. Fadul mediante la cual informó que la cancelación del contrato se debió a múltiples deficiencias en el servicio e hizo referencia a un evento que ocurrió el 10 de junio de 2021 en el que uno de los empleados de Evolution Services incumplió con su deber de respeto hacia los clientes.

4. El 2 de mayo de 2022, el Sr. Fadul envió una carta a CBL Realty mediante la cual le advirtió que el señalamiento de deficiencias informadas en la misiva del 27 de abril de 2022 debió haberse expuesto en virtud de la cláusula 5.1 del contrato. En cuanto al asunto del empleado que presuntamente incumplió con su deber de respeto, el Sr. Fadul explicó que Evolution Services aplicó un protocolo interno de investigación en el que se concluyó que el empleado padece de una condición reconocida por la Ley de Educación para Individuos con Discapacidades Federal y de la Ley de Servicios Educativos Integrales para Personas con Impedimentos, Ley Núm. 51-1996 (18 LPRA sec. 1351 *et seq.*). Además, aclaró que, respecto a esto último, lo pertinente era que CBL Realty se acogiera a la cláusula 3.3.6 del contrato, la cual establece que "A petición por escrito del CLIENTE, el CONTRATISTA retirará del servicio a cualquiera persona que viole alguna disposición del reglamento o que ocasione un detrimento al CLIENTE". Al final de la misiva, Evolution Services informó lo siguiente: "Debido a que vemos interés de su

parte en no hacer valer el contrato y que según cada conversación esto no [será] fructífero según lo acordado, hemos tomado la decisión de cancelarle el servicio inmediatamente y someter el restante término del contrato a cobro".

5. El 3 de mayo de 2022, la Sra. Benítez respondió el comunicado descrito en el acápite anterior y aceptó que CBL Realty incumplió inicialmente con el procedimiento dispuesto en el contrato respecto a su cancelación. A su vez, propuso un contrato a término fijo de un año sin renovación automática con tres condiciones sugeridas por CBL Realty.

6. El 5 de mayo de 2022, el Sr. Fadul le respondió a la Sra. Benítez y le informó que las condiciones que exigió CBL Realty para rectificar no fueron acorde a las políticas o modo de operar de Evolution Services.

7. Entre el 1 de mayo de 2021 y el 1 de mayo de 2022, Evolution Services emitió doce facturas, respecto a los servicios de limpieza y mantenimiento efectuados cada mes.

8. CBL Realty expresó que el 19 de mayo de 2022 el Sr. González, en representación de Evolution Services, retiró unos equipos de limpieza de su localidad, y que el 20 de mayo de 2022, Evolution Services le entregó el *key pad* de la entrada al edificio Calaf 381.

A tenor con las referidas determinaciones de hechos, el TPI determinó que CBL canceló el Acuerdo unilateralmente, por lo que incumplió con las obligaciones contractuales. No obstante, el foro primario razonó que no se le había colocado en posición para conceder la cantidad de $13,562.76, por lo que resolvió que procedía la celebración de una vista para llevar a cabo la valoración de los daños e identificar la procedencia de la cuantía reclamada.

En desacuerdo con el dictamen, el 20 de marzo de 2024, CBL instó una *Moción Solicitando Determinaciones de Hechos Adicionales y Moción de Reconsideración*[21]. En cuanto a la solicitud de determinaciones adicionales, CBL enumeró un total de quince (15) determinaciones, las cuales, a su juicio, no fueron controvertidas por la parte apelada, por lo que el TPI debía incluirlas en su dictamen. Con respecto a la solicitud de reconsideración, insistió nuevamente en que ESG no tenía potestad para cancelar el Acuerdo

---

[21] Apéndice del recurso, págs. 238-249.

unilateralmente, puesto que, según las cláusulas de este, la única razón por la cual podía cancelar el mismo era el atraso de dos (2) mensualidades por parte del cliente. De modo que, la parte apelada no tenía derecho a cancelar el Acuerdo ni a cobrar el monto restante del mismo.

Por otro lado, sostuvo que ESG pretendía cobrar los servicios sin haber rendido los mismos, lo que constituiría un enriquecimiento injusto por su parte. Finalmente, arguyó que no era necesaria la celebración de la vista.

El 9 de abril de 2024, ESG se opuso a través de *Oposición a Moción Solicitando Determinaciones de Hecho Adicionales y Moción de Reconsideración*[22]. En resumidas cuentas, la parte apelada sostuvo que CBL no cumplió con el requisito de particularidad y especificidad que exige la Regla 47 de Procedimiento Civil[23], al presentar su solicitud de reconsideración.

Cabe señalar que, en el ínterin, específicamente el 21 de marzo de 2024, ESG presentó *Moción en Solicitud de Reconsideración*[24]. Luego, el 10 de abril de 2024, CBL instó *Réplica a "Moción en Solicitud de Reconsideración"*[25].

El 10 de junio de 2024, el TPI emitió dos dictámenes[26], declarando No Ha Lugar tanto la moción presentada por CBL, como la solicitud de reconsideración instada por la parte apelada[27].

Inconforme aun, el 1 de julio de 2024, CBL presentó el recurso de epígrafe y señaló al TPI la comisión del siguiente error:

> ERRÓ EL TPI AL CONCLUIR QUE EL INCUMPLIMIENTO DEL APELANTE CON LAS CLÁUSULAS CONTRACTUALES SOBRE LA CANCELACIÓN DEL CONTRATO LE OTORGABAN AL APELADO EL DERECHO DE CANCELAR POR SU PARTE EL CONTRATO UNILATERALMENTE Y SOLICITAR EL PAGO CORRESPONDIENTE A SERVICIOS FUTUROS DE LIMPIEZA NO PRESTADOS.

---

[22] Apéndice del recurso, págs. 253-255.
[23] 32 LPRA Ap. V, R. 47.
[24] Apéndice del recurso, págs. 250-252.
[25] Apéndice del recurso, págs. 256-264.
[26] Apéndice del recurso, págs. 265-266 y 267-268.
[27] Ambas resoluciones fueron notificadas el 11 de junio de 2024.

El 30 de julio de 2024, ESG compareció mediante *Alegato en Oposición a Apelación*[28].

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**-A-**

El Tribunal Supremo de Puerto Rico ha expresado en varias ocasiones que la sentencia sumaria es un remedio extraordinario y discrecional que sólo se debe conceder cuando no existe una controversia genuina de hechos materiales y lo que resta es aplicar el derecho[29]. En términos generales, al dictar sentencia sumaria, el tribunal deberá hacer lo siguiente:

> (1) analizar los documentos que acompañan la solicitud de sentencia sumaria y los que se incluyen con la moción en oposición, así como aquellos que obren en el expediente del tribunal;
>
> (2) determinar si el oponente de la moción controvirtió algún hecho material y esencial, o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos[30].

Analizados estos criterios, el tribunal no dictará sentencia sumaria cuando existan hechos materiales y esenciales controvertidos; cuando haya alegaciones afirmativas en la demanda que no han sido refutadas; cuando surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material y esencial, o cuando como cuestión de derecho, no procede[31]. La sentencia sumaria se puede dictar a favor o en contra de la parte que la solicita, según proceda en Derecho[32].

---

[28] Hacemos constar que, el 8 de agosto de 2024, la parte apelante instó ante este foro apelativo una *Moción Solicitando Orden y/o Resolución*. En la misma fecha, ESG se opuso mediante *Oposición a Moción Solicitando Orden y/o Resolución*. Evaluados los escritos presentados, remitimos a las partes a lo resuelto en la presente Sentencia.
[29] *Maldonado v. Cruz*, 161 DPR 1, 39 (2004).
[30] *Vera v. Dr. Bravo*, 161 DPR 308, 334 (2004).
[31] *Íd.*, págs. 333-334.
[32] *Maldonado v. Cruz, supra,* pág. 39.

Por tratarse de un remedio discrecional, el uso del mecanismo de sentencia sumaria tiene que ser mesurado y solo procederá cuando el tribunal quede claramente convencido de que tiene ante sí documentos no controvertidos[33]. Es importante mencionar que, este Tribunal utilizará los mismos criterios que el TPI al determinar si procede una moción de sentencia sumaria[34].

Los criterios que este foro intermedio debe tener presentes al atender la revisión de una sentencia sumaria son los siguientes:

1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil y la jurisprudencia le exigen al foro primario;

2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36;

3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos;

4) y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia[35].

**-B-**

En nuestra jurisdicción, los contratos son fuente de las obligaciones[36]. Y, las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes, y deben cumplirse al tenor de los mismos[37].

El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, para crear, regular, modificar o extinguir alguna obligación[38]. Los contratos se perfeccionan por el mero consentimiento de las partes sobre el objeto y la causa[39]. Para

---

[33] *Íd.*
[34] *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679 (2018).
[35] *Íd.*
[36] Art. 1063 del Código Civil, 31 LPRA sec. 8984.
[37] Art. 1233 del Código Civil, 31 LPRA sec. 9754.
[38] Art. 1230 del Código Civil, 31 LPRA sec. 9751.
[39] Art. 1237 del Código Civil, 31 LPRA sec. 9771.

que un contrato sea válido deben concurrir los siguientes requisitos: (1) consentimiento de los contratantes, (2) objeto cierto que sea materia del contrato y (3) causa de la obligación que se establezca[40].

Los tribunales de justicia no pueden relevar a una parte de cumplir con lo que se obligó a hacer mediante contrato, cuando dicho contrato es legal y válido y no contiene vicio alguno[41].

**-C-**

En nuestro ordenamiento jurídico rige el principio general de que, en las obligaciones bilaterales, ninguna de las partes contratantes puede exigir el cumplimiento de la obligación contraria sin antes cumplir u ofrecer el cumplimiento de la obligación propia[42]. Esto es lo que se conoce como la doctrina de excepción de contrato no cumplido (*exceptio non adimpleti contractus*)[43]. En esencia, la excepción de contrato no cumplido puede levantarse como defensa por una de las partes contratantes, cuando la otra exige la satisfacción de la prestación debida, pero ha incumplido con la suya propia[44].

Por otro lado, se ha reconocido la modalidad de excepción de contrato no cumplido adecuadamente o, excepción de falta de cumplimiento regular (*exceptio non rite adimpleti contractus*)[45]. Este principio, por su parte, aplica en instancias en las que una de las partes "pretender exigir el cumplimiento de una obligación[,] a pesar de que [esta] ha cumplido parcial o defectuosamente con su prestación"[46].

---

[40] *Master Concrete Corp. v. Fraya, S.E.*, 152 DPR 616, 625 (2000).
[41] *Mercado, Quilichini v. U.C.P.R.*, 143 DPR 610, 627 (1997).
[42] Art. 1253 del Código Civil, *supra*; *Álvarez v. Rivera*, 165 DPR 1, 20 (2005); *Mora Dev. Corp. v. Sandín*, 118 DPR 733, 742 (1987).
[43] *Álvarez v. Rivera, supra*; *Mora Dev. Corp. v. Sandín, supra*.
[44] *Álvarez v. Rivera, supra*; *Mora Dev. Corp. v. Sandín, supra*.
[45] *Álvarez v. Rivera, supra*, págs. 20-21.
[46] *Álvarez v. Rivera, supra*, págs. 21-22.

**III.**

De entrada, nos corresponde revisar si las mociones presentadas por las partes de epígrafe cumplieron con las formalidades impuestas por nuestro ordenamiento civil procesal. Tras una revisión ponderada del expediente ante nuestra consideración, colegimos que, tanto la moción de sentencia sumaria, como su respectiva oposición, cumplieron con los requisitos de forma codificados en la Regla 36.3 de Procedimiento Civil[47].

Asimismo, coincidimos con el razonamiento del foro primario en cuanto a que en el presente caso no existen hechos materiales en controversia, y lo único que subsiste es una controversia de derecho. De modo que, nos corresponde revisar si el TPI aplicó correctamente el derecho al asunto que nos ocupa.

En el presente caso, CBL señala que el foro primario incidió al concluir que las cláusulas del Acuerdo facultaban a ESG a cancelar el mismo unilateralmente, y a solicitar, además, el pago de servicios futuros de limpieza. Aduce que, de conformidad a las cláusulas pactadas, ESG podía cancelar el Acuerdo únicamente cuando CBL adeudara dos (2) meses de pago, lo cual no ocurrió. Por otro lado, la parte apelada insiste en que CBL incumplió con el Acuerdo al cancelar el mismo unilateralmente, sin cumplir con las referidas cláusulas.

Según se desprende, CBL contaba con dos (2) alternativas para proceder con la cancelación del Acuerdo. En primer lugar, la parte apelante podía notificar su intención de no renovar el Acuerdo, enviando una comunicación por correo certificado, treinta (30) días antes de que operara la renovación automática. Como segunda opción, y en caso de alguna falla en los servicios ofrecidos por la parte apelada, CBL podía objetar tal incumplimiento a través de una

---

[47] 32 LPRA Ap. V, R. 36.3.

misiva, también remitida por correo certificado. Una vez enviada la misma, ESG contaría con un periodo de quince (15) días para remediar la deficiencia. Si ESG no corregía la falla en dicho periodo, CBL podía proceder con la cancelación, concediendo un periodo de treinta (30) días para su efectividad.

Sin embargo, CBL no cumplió con ninguna de estas dos (2) opciones. En relación con la primera, y toda vez que el Acuerdo fue pactado el 1 de mayo de 2021, por lo que se renovaría automáticamente el 1 de mayo de 2022, CBL debía enviar su notificación de cancelación el 1 de abril de 2022. No obstante, la primera notificación, la cual no cumplía con los términos del Acuerdo, fue enviada a ESG el 22 de abril de 2022.

En cuanto a la segunda opción, observamos que CBL tampoco cumplió con la misma. Aun cuando en la carta enviada el 27 de abril de 2022, CBL notificaba varias deficiencias en los servicios, esta solicitó la cancelación del Acuerdo, "a partir de la carta enviada el pasado 22 de abril de 2022"[48]. Esto, sin proveer a ESG la oportunidad de rectificar las fallas en un periodo de quince (15) días, conforme dispone la cláusula 5.1.

Ahora bien, contrario a lo resuelto por el foro primario, la inobservancia del trámite pactado para llevar a cabo la cancelación **no** constituye un incumplimiento contractual por parte de CBL. El que la parte apelante no ejecutara la cancelación del Acuerdo de conformidad a las cláusulas pactadas, tuvo como único resultado la ineficacia de esta. Es decir, toda vez que CBL no informó la cancelación del Acuerdo según lo pactado, la cancelación no tuvo lugar. Valga señalar que así lo reconoció la parte apelante.

Así pues, el Acuerdo en cuestión no solo continuó en vigor, sino que fue renovado automáticamente por un periodo de doce (12)

---

[48] Apéndice del recurso, pág. 109.

meses adicionales, de conformidad a la cláusula 4.1. Ante tal circunstancia, las partes de epígrafe venían obligadas a continuar cumpliendo con sus obligaciones. ESG debía continuar brindando los servicios convenidos, mientras que CBL debía emitir los pagos correspondientes. Sin embargo, la parte apelada optó por cancelar el Acuerdo unilateralmente.

En su misiva del 2 de mayo de 2022, ESG explicó lo siguiente: "[d]ebido a que vemos interés de su parte en no hacer valer el contrato y que según cada conversación esto no sea fructífero según lo acordado hemos tomado la decisión de cancelarle el servicio inmediatamente y someter el restante término del contrato a cobro"[49].

Al revisar las disposiciones contractuales pactadas por las partes, observamos que dicha motivación no está reconocida en el Acuerdo como una razón por la cual ESG podía cancelar el mismo. Según consignado por el TPI en su determinación de hecho número 1(c), la cláusula 5.2 del Acuerdo dispone expresamente que ESG podía proceder con la cancelación, únicamente cuando el cliente tuviese un atraso de pago de dos (2) meses. No surge evidencia del expediente que demuestre que ello ocurrió en el presente caso. Por el contrario, junto a su oposición a la moción de sentencia sumaria, la parte apelante anejó evidencia de todos los pagos realizados a ESG desde el mes de mayo de 2021, hasta abril de 2022[50].

De lo anterior, se desprende sin más que ESG procedió con la cancelación del contrato en contravención a las disposiciones pactadas. Esto es, la parte apelada canceló el contrato sin que CBL estuviese incurriendo en un atraso de dos (2) meses. Ante ello,

---

[49] Apéndice del recurso, pág. 61.
[50] Apéndice del recurso, págs. 199, 201, 203, 205, 207, 209, 211, 213, 214, 216, 218 y 220.

resulta forzoso concluir que **ESG incumplió con los acuerdos contractuales pactados**.

Según expuesto, una vez el contrato queda perfeccionado, lo pactado tiene fuerza de ley entre las partes[51]. En caso de que una de las partes incumpla con su obligación, la otra puede exigir su cumplimiento[52]. Ahora bien, de conformidad al principio de excepción de contrato no cumplido, una parte contratante que incumple con su propia obligación no puede exigir el cumplimiento de la obligación contraria[53].

En el presente caso, ESG instó la *Demanda* exigiendo la cantidad de $13,562.76, equivalente al año de servicios corriente, tras la alegada cancelación del Acuerdo. Esto, pues la misma cláusula 5.2 que permite que el contratista cancele el Acuerdo –únicamente cuando el cliente adeude dos (2) meses–, dispone, además, que este podría "reclamar el término restante del Acuerdo y cualquier otra cantidad debida"[54].

Sin embargo, en vista de que ESG no cumplió con su obligación de cancelar el Acuerdo de conformidad a las disposiciones pactadas, este no puede exigir el cumplimiento de la obligación de CBL, a saber, el pago de $13,562.76. Insistimos en que, nuestro ordenamiento jurídico dispone que una parte contratante no puede exigir el cumplimiento de la obligación contraria cuando no ha cumplido con la suya propia[55].

Por lo antes esbozado, determinamos que el error señalado fue cometido. El Acuerdo pactado por las partes de epígrafe quedó cancelado unilateralmente por ESG, más, su incumplimiento con las cláusulas contractuales en cuanto a la manera de llevar a cabo

---

[51] Art. 1233 del Código Civil, 31 LPRA sec. 9754.
[52] Art. 1255 del Código Civil, 31 LPRA sec. 9823.
[53] Art. 1253 del Código Civil, *supra*; *Álvarez v. Rivera, supra*, pág. 20; *Mora Dev. Corp. v. Sandín, supra.*
[54] Apéndice del recurso, pág. 102.
[55] *Álvarez v. Rivera, supra*; *Mora Dev. Corp. v. Sandín, supra.*

dicha cancelación tiene como resultado el que no pueda reclamar cantidad alguna.

**IV.**

Por los fundamentos antes expuestos, ***revocamos*** la *Sentencia Parcial* apelada y desestimamos, con perjuicio, la causa de acción incoada por Evolution Services Group, LLC.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones